STATE, Respondent v. HUSMAN, Appellant

(287 N. W. 30.)

(File No. 8203.   Opinion filed July 15, 1939.)

*J. H. Lammers,* of Madison, for Appellant.

*Clair Roddewig,* Atty. Gen., *Ellsworth E. Evans,* Asst. Atty. Gen., and *Charles S. Hanson,* of Howard, for Respondent.

RUDOLPH, J. The defendant, Fred Husman, was convicted of rape in the first degree and has appealed to this court. The sufficiency of the evidence to sustain the conviction is not questioned by anyone except the author of the dissenting opinion. Appellant states in his brief, "That there is evidence sufficient to justify the verdict of the jury, if believed, is conceded." Appellant has set forth forty-seven different assignments of error, many of which relate to objections to testimony. Only those assignments of error of sufficient importance to warrant discussion will be referred to in this opinion.

The first assignment of error, and the one upon which appellant apparently principally relies, relates to the refusal of the trial court to grant appellant's motion for a change of venue from Miner County. This motion was supported only by affidavits of appellant and his counsel. Neither appellant nor his counsel were residents of Miner County. There were no supporting affidavits by the residents of the county. The affidavit of appellant sets out in substance that appellant is a resident of Lake County; that the complaining witness and her parents had lived in Miner County, the county in which the case was tried, for a number of years, and were well and favorably known in the county; that at the preliminary hearing which was held in Miner County, a large crowd assembled and threats (without stating what these threats were) were uttered against the appellant; that "he believes that the sentiment of the citizens of Miner County is very much against him and that he cannot have a fair and impartial trial in said county; that the commission of the offense with which the defendant is charged and purported facts connected with it have been widely and extensively published and circulated by various and divers newspapers in the southeastern portion of the State of South Dakota." The affidavit of counsel for the appellant was to the same tone and effect as to that of the appellant with the exception that this affiant stated that at the preliminary hearing, the state's attorney asked that the amount of appellant's bail be fixed at such a large amount that it would be impossible for appellant to secure such bail, and thereby keep appellant in jail and prevent any mob violence. A clipping from the Daily Argus Leader was submitted with this affidavit, containing a purported account of the alleged crime, which, it is alleged, was prejudicial to the defendant and appellant. It is alleged that the Daily Argus Leader is read widely and extensively in Miner County.

This motion for change of place of trial was resisted on behalf of the state. The state's attorney submitted an affidavit setting forth that the girl upon whom the alleged attack was made had moved from Miner County and was then living in the state of California; that she and her mother had been brought from California at the expense of Miner County to attend the trial, which would be delayed if a change of venue was granted; that since the girl and her family left Miner County, there had been no

particular discussion of the case, and that there was no feeling of prejudice. against the defendant existing in Miner County; that there had been no general discussion of the case in Miner County for a period of several months. This affidavit further denied that the Argus Leader was widely read in Miner County. In addition to the affidavits of the state's attorney a large number of residents of Miner County from different townships throughout the county submitted affidavits. The general purport of these affidavits was that the case had had no general discussion and that there existed no feeling of prejudice or bias against the defendant. It also appears that immediately following the preliminary hearing the appellant secured bail and was released from jail, and was not disturbed in anyway upon his release.

We think it clear that there was no abuse of discretion by the trial court in refusing to change the place of trial. The showing made by the appellant consisted to a large extent of the unsupported assertions of himself and counsel. These assertions were largely conclusions of affiants which had no support in any facts set forth in the affidavits, and as such could form no basis upon which to change the place of trial. Territory v. Egan, 3 Dak. 119, 13 N. W. 568. Judge Polley has accepted these unsupported assertions and conclusions of affiant and his counsel as statements of absolute fact, and entirely ignored the many affidavits submitted by disinterested citizens throughout the county, all of which were before the trial court. No complaint is made that a fair jury was not obtained nor does it appear that appellant exhausted his peremptory challenges or had any difficulty in securing a jury satisfactory to him. There is nothing in this record to show that the defendant did not have a fair and impartial trial because of any feeling of prejudice in the minds of the inhabitants of the county. In the case of State v. Meservey, 53 S. D. 60, 220 N. W. 139, 141, the trial court refused to change the place of trial, and this court sustained that action notwithstanding a much stronger showing than that made in this case. It was said in that case that "in allowing or refusing a change of venue the court must be governed by a sound judicial discretion." Unless there is an abuse of such discretion, this court will not interfere. No abuse of discretion has been shown.

██ The appellant next complains of certain alleged misconduct of the state's attorney in presenting the case to the jury. With one exception, there was no objection made by appellant at the time the alleged improper remarks were made, nor was the court requested to caution the jury against the force of such remarks, and no exception thereto appears to have been taken. This court said in the case of State v. Christensen, 46 S. D. 61, 190 N. W. 777, 779: "We think it was the duty of the defendant, if he desired to save this exception for the appellate court, to challenge by a proper objection the statement made by the state's attorney and obtain a ruling upon the objection thereto, and that the defendant should then request the trial court to give a proper instruction thereon; and, failing to do so, he cannot now be heard to complain. State v. Knudson, 21 N. D. 562, 132 N. W. 149, and authorities cited therein."

This court adhered to the same rule in the case of Behseleck v. Andrus, et al., 60 S. D. 204, 244 N. W. 268, 270, 88 A. L. R. 596, wherein it said, "For the purposes of review upon appeal, it is too late to take exceptions to argument of counsel to the jury after the jury has retired," and noted with approval the following from the case of Crumpton v. United States, 138 U. S. 361, 11 S. Ct. 355, 356, 34 L. Ed. 958: "There is no doubt that, in the excitement of an argument counsel do sometimes make statements which are not fully justified by the evidence. This is not such an error, however, as will necessarily vitiate the verdict or require a new trial. It is the duty of the defendant's counsel at once to call the attention of the court to the objectionable remarks, and request his interposition, and, in case of refusal, to note an exception."

The one objection made by appellant to the remarks of counsel occurred during the argument of the assistant attorney general to the jury, when this counsel was arguing that the sheriff went to a certain designated spot to locate a rock which was testified about in the evidence. Counsel for defendant objected to this argument on the ground that the uncontradicted evidence disclosed that the witness did not go to the particular spot to which he had been directed. The court advised the jury that regardless of counsel's argument, it was for the jury to determine whether the witness went to the designated place or not, and instructed counsel on both sides to

keep to the record in their argument to the jury. Whether the sheriff went to the particular spot to which he was directed was for the jury to determine, and the jury was so instructed by the court. Counsel on the one hand claimed that he did, and counsel on the other claimed that he did not. The jury, however, heard the evidence and were, undoubtedly, qualified to decide this issue.

The appellant next complains of the introduction into evidence of certain small pieces of metal which the sheriff testified were scraped from the surface of a certain rock. The introduction of this evidence came about in substantially the following manner. The prosecuting witness testified that, as the car, in which the criminal act took place, was leaving the place where the act was perpetrated, the underside of the car struck some object and thereafter made a loud and peculiar noise, and a noise similar to that which a car would make if its exhaust were not muffled. The alleged criminal act took place on the 13th day of the month, and it was not until the 21st day of the same month that the sheriff inspected the rock which it was claimed the car struck as it was leaving the scene of the crime. The sheriff testified that this rock had been moved from its position as if struck by some heavy object, and that he took from the top of this rock the small scrapings which he produced in evidence. We think it clear that the weight to be given this evidence was for the jury. The rock was at the location given by the prosecuting witness as the place where the car struck some object. The road in which this rock was located had not been graded and was a "prairie trail," with very little travel. Appellant complains because eight days elapsed before this rock was examined by the sheriff, but in view of the entire record, we believe the question of whether this evidence was too remote to be admissible was for the trial court to determine, and its determination will not, under the circumstances here presented, be disturbed. In any event this evidence would not be prejudicial. It is undisputed in this record that the car in which the unlawful act took place, struck something as it was leaving the place where the offense was committed. This the prosecuting witness testified to positively, and this fact stands undisputed in the record. The only answer made by appellant was that he was in a different county at the time. The effect of this testimony, if given any

weight by the jury, therefore, was simply to corroborate a fact which was undisputed.

The state's attorney asked the following question of one of the witnesses: "Haven't you heard rumors as to the defendant having molested some other girls?" The state's attorney at the time was crossexamining the witness, Edna Atkinson, who was placed on the stand as a witness to testify to the defendant's good reputation and for this purpose only. She testified concerning the defendant: "He has lived in that community ever since (Spring of 1929) and during that period of time I have been acquainted with his reputation for chastity, morality and virtue. That reputation has been good and it is good now as far as I know." Following this testimony the state's attorney interrogated the witness as set out above, and an objection to the question by the defendant was sustained by the court. This is not a case where there has been an attempt to establish a crime by proof of another and independent crime, but a case where defendant has put in issue his reputation for chastity and virtue. The rule is well settled that a witness testifying to good reputation may be cross-examined, for the purpose of testing his credibility, as to whether he has heard rumor of particular misconduct inconsistent with the reputation he has attributed to the person in question. Jones on Evidence, Section 2346; 22 C. J. 483; 20 Am. Jur., Evidence, 306; and the many cases cited in the texts. Under this general holding, we believe, the trial court would not have committed error had he permitted the witness to answer. Had the witness been permitted to answer and answered the question in the affirmative, the effect of her testimony that the defendant bore a good reputation for chastity, morality and virtue would have been substantially weakened. Being of the opinion the court could have permitted the witness to answer without committing error, certainly there was no error in the state's attorney propounding the question. The defendant had seen fit to place in issue his reputation for morality, chastity and virtue, and having done so he cannot now complain because the state's attorney saw fit to ask a question upon cross-examination relative and pertinent to that reputation.

In their enthusiasm for their respective causes, counsel on both sides of this litigation indulged in acts and made remarks which, to say the least, were not such as to receive a court's com-

mendation. The trial court was compelled on several occasions to caution counsel. On one of these occasions the court said: "Let the record show that at various times in the trial both counsel for the state and defendant have acted peevish in the matter but it doesn't appear to the court that there is any prejudice and the court therefore says to both counsel to refrain from further remarks of that peevish nature."

After a careful review of the record, we are satisfied, as was the trial judge, that no prejudice resulted.

The judgment and order appealed from are affirmed.

ROBERTS and SMITH, JJ., concur.

WARREN, P. J., concurs in result.

POLLEY, J., dissents.

POLLEY, J., (dissenting). I am not able to concur with the majority of the court in an affirmance of the conviction of the defendant in this case. In the first place, I think the showing made by the defendant in support of his application for a change of place of trial should have been granted. I think also that the conviction, so far at least as the act charged in the information is concerned, is based very largely upon incompetent and immaterial evidence and that if such evidence were excluded from the record there would not be sufficient competent evidence left to support the conviction.

Defendant, with his wife and family, resided on a farm about six miles southwest of Madison, in Lake county, where he had resided since about 1930. Prior to that time he had spent his entire life in Platt county, in the state of Nebraska. At the time of the commission of the alleged crime he was something more than 50 years of age. He had a family consisting of a wife, three daughters and two sons. At the time of the trial the youngest daughter was attending the Normal School at Wayne, Nebraska; the other two daughters were teaching school near Platt, Nebraska, where they had grown from childhood. The older of the two received her teacher's training at Sioux Falls College, while the younger one received her training at Wayne Normal School at Wayne, Nebraska. The ages of these three girls were 18, 21 and 26. The two sons, 24 and 25 years old, respectively, live at home and do the farm work on their father's farm. Defendant's health had

failed several years prior to the time of the alleged offense and because of that fact he was not able to do farm work.

At the trial defendant put his reputation for morality, virtue and chastity in issue, and numerous witnesses living in the vicinity of defendant's home went upon the stand and swore that they knew defendant's reputation for morality, virtue and chastity and that it was good. No witness testified to the contrary and there certainly was no taint upon his reputation for morality, virtue, and chastity in the neighborhood where he was best known. There is not one man in a thousand who, at the age of more than fifty years, could show that he had lived as clean and exemplary a life as the evidence shows that defendant had lived, and it is not in accordance with human nature that a man who had lived such a life as the evidence shows defendant had lived until he was more than fifty years old, would then instantly turn into a beast and go out on a public road and drag a school girl into an automobile and rape her by the side of the road in broad daylight.

The victim of the alleged crime was Dorothy Forsberg, a high school girl fifteen years of age attending the high school at Canova in Miner county. She was the daughter of long time residents and highly respected parents living adjacent to the town of Canova. Miner county is a small county, only 24 miles square and when, on the evening of October 13 it was learned that Dorothy Forsberg had been raped on a public highway, in broad daylight, and in the very outskirts of town, a wave of anger and indignation swept over the entire county, and the alleged offense became a matter of angry discussion.

The defendant was arrested in Lake county on the 22d day of October, charged with the said crime, and on the 28th day of October he was given a preliminary hearing in the county court house, in the city of Howard, the county seat of Miner county. A large crowd of Miner county residents attended said hearing and heard the testimony of said Dorothy Forsberg and other witnesses for the state; the said offense then became and thereafter was the subject of gossip and discussion by the residents of Miner county.

Feeling adverse to defendant was so high throughout the county that defendant and his counsel were of the opinion that defendant could not have a fair and impartial trial in Miner county,

and on the day the information was filed defendant moved the court to send the case to some other county in the state for trial.

It is shown by affidavits filed on behalf of defendant, that at the said hearing sentiment was very much against the defendant; that while there was no mob violence at said hearings, the minds of the assembled crowd were very much inflamed and threats of violence were uttered against the defendant. The nature of the offense charged is such as would greatly anger the residents of the entire community.

In addition to the general discussion of the alleged offense, the newspapers throughout the county published accounts of the affair. On the other hand, some accounts were written in a tone that assumed the absolute guilt of the defendant. This is especially noticeable in an account that appeared under large headlines on the front page of the Argus Leader on the 29th day of October. The Argus Leader is the largest, most widely circulated, and most influential newspaper in this state. The account in the Argus Leader follows in full:

<blockquote>

"Junius Farmer is Accused of
Attacking Girl

"Tea Girls Identify Man as One who At-
tempted to Abduct Them

"Freed on $5,000 Bonds.

"Fred Husman, Married Man with Family, bound over to March Court term. Howard, S. D., Oct. 29.—Fred Husman 55-year-old farmer residing four miles south of Junius, is at liberty under $5,000 bond after a hearing on a statutory charge here Thursday at which he was accused of attacking a 15 year-old Canova high school girl. Husmann was bound over to the March term of Circuit Court.

"Threatened Death

"The Canova girl and a companion, while on their way home from school, were offered a ride by a man driving a black Dodge automobile. The companion was let out of the car at an intersection near her home. The man then drove on about a quarter of a mile, stopped, drew a gun, and blindfolded the girl. He forced her to lie on the floor while he drove past her home and on several miles further. After a criminal attack the man turned around and

</blockquote>

proceeded to the girl's home. Letting her off at the driveway, he threatened death if she reported the assault.

"Husman's arrest was made upon an unusual clue.

#### "Car Had Strange Noise

"While riding in the car of her assailant the Canova girl noticed a peculiar noise when the vehicle struck bumps and ruts in the road. Several days later a Madison car salesman remarked that a car had been brought to a garage there because the bumpers were loose and made a grating sound. Sheriffs Ray Olson of Lake county and Walter Zimmerman of Miner county investigated and Husman's arrest followed. Both girls identified Husman as the man who gave them a ride.

"The hearing at which Husman was bound over was held before Justice Charles Christiansen, with State's Attorney Charles Hanson of Miner county representing the state and J. H. Lammers of Madison the defendant. Husman is married and has a family.

#### "May Clear Up Other Cases

"Officers here believe that the arrest of Husman solves the attempted abduction of two girls near Tea, S. D. September 21. A number of other cases have been reported where a middle-aged man has been bothering young girls. In the Tea case, Evelyn and Dorothy Hanson, 14 and 16, respectively, were walking along a country road when a stranger pulled up in his car, stopped and offered them a ride. The girls refused, and the man said, 'Oh, that's all right, I'm your neighbor.' The Hanson family had recently moved into the vicinity and the girls thought the man was telling the truth, so they got into the car.

#### "Girl Fools Man

"After driving a while the man drew a gun and commanded the girls to hold up their hands. He attempted to blindfold them with rags. Evelyn, the younger girl, had an inspiration. 'Oh goody, here comes daddy,' she said as she saw a car at a distance. The man was frightened. He shoved the girls out of the car, told them to 'beat it and don't say anything about this,' and drove away."

The tone of the foregoing article is such as to imply the absolute certainty of the guilt of defendant. But not content with charging the defendant with the crime involved in this case the

defendant is connected with other sex-crimes and by implication defendant is accused of having repeatedly molested young girls on public highways. Of these charges the record in the case contains not a scintilla of evidence, but the defendant was compelled to go to trial for the offenses charged in the Argus Leader as well as the one charged in the information.

That public feeling in Miner county ran very high against the defendant was recognized by the state's attorney of Miner county from the time of defendant's arrest. Almost immediately after the arrest defendant made application for bail. This application was resisted by the state's attorney of Miner county. Before the preliminary hearing the demonstration of anger against the defendant was so pronounced that the state's attorney insisted on having the bail fixed so high that the defendant "would be unable to procure bail, and that by reason of his inability to procure bail, he could be kept in jail so that there would be no mob violence", and that affiant (defendant's counsel) was further advised by said state's attorney that it would be to the best interests of the defendant and all parties concerned, that the defendant remain in jail to prevent mob violence; that sentiment against the defendant was so pronounced, that he should be kept in jail in order to avoid mob violence; that since said preliminary hearing the purported facts connected with the commission of said offense have been the subject of continual discussion among the citizens and residents of Miner county, and that such discussions had served to keep alive the bitter feeling of prejudice against the defendant existing at and throughout said county of Miner, and that an excited state of public feeling existed in Miner county, against the defendant; that public sentiment of Miner county was strongly aroused against the defendant, and that a calm and dispassionate inquiry into the merits of the controversy involved in this action could not be had in Miner county; that by reason of all the foregoing facts and circumstances the defendant could not have a fair and impartial trial in Miner county; that there existed a bias and prejudice against the defendant to such an extent and of such a character as to create a reasonable doubt as to the impartiality of any jury, however carefully and painstakingly it might be selected; that the feeling of the people of Miner county is so violently inflamed toward the accused that he cannot have a fair and impartial trial within the

county of Miner; and that affiant verily believes that if this case is tried in Miner county, that there will assemble at the court house a large and unruly group of people which will result in an atmosphere of bias and prejudice against the defendant so that any jury selected to try the issues in said case cannot help but be affected thereby; that affiant verily believes that danger of mob violence still exists in Miner county, and will continue to exist throughout the trial of this action if the defendant is tried in Miner county; that the public sentiment and excitement of the citizens and residents of Miner county as it now exists and will continue to exist during the trial of the case, if the case is tried in Miner county, will have a tendency to intimidate and swerve the jury; that there is now a wide-spread popular feeling among the citizens and residents of Miner county, against the defendant and that the members of any jury which may be chosen to try the issues of said case in Miner county, cannot be free from bias and prejudice and that a fair and impartial trial cannot be had in Miner county.

That it was the intention of the state's attorney for Miner county to so bias and prejudice the minds of the jurors against defendant that they would convict him regardless of whether he was guilty or innocent is shown by the conduct of the state's attorney after the beginning of the trial. In his opening argument to the jury the state's attorney said to the jury: "He (meaning the defendant), is a sex pervert, a moron and a person lower than a beast." This statement was without foundation whatever in the evidence. The evidence showed that defendant had lived more than a usually clean life. This is strongly corroborated by the kind of a family he had reared. No moron or sex pervert could have reared three daughters and two sons of the class and standing of the defendant's five children. The evidence shows, without dispute, that on the afternoon and at the very time of the commission of the alleged offense defendant was down in McCook county where he traded buck sheep with a man by the name of John T. Anderson. This transaction was slurringly referred to by the state's attorney, and just following the above quoted remarks he said: "I don't know what he wanted with a buck," the implication being that the defendant being the beastly sex pervert that he was could breed his sheep himself and had no use for the

services of a buck. These remarks were deliberately made and were made for no other purpose than to poison the minds of the jurors against the defendant, and to bias and prejudice their minds against defendant and secure a verdict of conviction of the defendant regardless of whether he was guilty or innocent. This was misconduct on the part of the. state's attorney of the most reprehensible character.

And to further illustrate the continued and persistent efforts on the part of the prosecuting attorneys in the case to bias and prejudice the minds of the jurors against the defendant and prevent his having a fair trial, at the close of the testimony of one of defendant's witnesses, Mr. Evans, an assistant attorney general, who had charge of the prosecution, asked the witness this question: Q. "Haven't you heard rumors as to the defendant having molested some other girls?" Counsel for defendant objected to this question as incompetent, irrelevant and immaterial, highly prejudicial, not proper cross-examination. "The defendant objects to the conduct of the assistant attorney general with reference to the question just asked this witness for the reason and upon the ground that same is highly prejudicial to the defendant and was intended solely for the purpose of creating bias and prejudice with the jury impanelled to try the issues in this case and is misconduct on behalf of said counsel."

In reply to this, Mr. Evans, the assistant attorney general, said: "Let the record show that counsel for the defendant has prior to this time called several character witnesses thereby putting in issue the defendant's reputation and character in his community and that counsel for the state at the time of asking this question believed and deemed the same proper under the rules laid down that character witnesses may be cross-examined about rumors which they have heard about the past reputation or character of the defendant or rumors about particular acts that the defendant has been accused of committing." To this statement the court replied: "Let the record show it appears to the court that the question was not asked in bad faith or was not misconduct, but the objection was sustained and such testimony and questions refused and the jury are instructed to pay no attention to any questions so asked as it is stricken out."

Going through the form of striking out this question and ad-

monishing the jury to pay no attention to any "questions so asked" did not remove from the minds of the jury the suspicion that had been created by the question. That suspicion could not be removed; and there is no way of knowing the extent to which this question may have influenced the minds of some or all of the jurors in arriving at their verdict. The error was incurable. In the case of People v. Robinson, 273 N. Y. 438, 8 N. E. 2d 25, recently decided by the New York Court of Appeals, the court say: "The incompetent questions put to the witness Shea concerning 'irregularities' uncovered by Shea's 'investigation' must have, at least, given to the jurors a suspicion that such irregularities existed even though the trial judge sustained objections to the questions. The minds of the jurors were thus prepared for the revelation that there were not only irregularities but 'various larcenies uncovered.' Admonition to disregard evidence which is stricken out is easy to give and hard to follow. Judges trained by years of experience to base decision solely upon competent evidence contained in the record are not always completely confident of their ability to disregard and remain uninfluenced by information, or even impressions, conveyed to them dehors the record. The trial judge could not by admonition cause the jurors to forget what they had been told nor could he eradicate the impression that the defendant by objections was successfully excluding proof that the defendant habitually committed larceny. It is impossible to say that it did not influence the verdict."

And in a more recent case, State v. Hines, on trial in New York City, a case of nation wide interest, on cross-examination of a defense witness, Mr. Dewey, the prosecuting attorney asked this question: "Don't you remember any testimony about Hines and the poultry racket?" The question had no reference to the offense for which the defendant was being tried. Counsel for defendant at once asked to have a mistrial declared. The trial justice recessed the court and after examining the law and considering the matter for two days declared a mistrial and discharged the jury. There is no official report of the trial, but it will be found set out in some detail in Time Magazine for September 19, 1938 on pp. 13, 14.

This question was considered by this court in State v. Zavitz, 50 S. D. 427, 210 N. W. 513. Defendant was on trial for larceny.

Evidence was admitted tending to prove another and different larceny. We reversed the case on this ground alone. In the present case it cannot be ascertained from the record whether the jury convicted the defendant because of the evidence relating to the rape of Dorothy Forsberg alone; or one of the sex crimes charged in the Argus Leader; or molesting girls on the highway, as suggested by the question of Mr. Evans; or whether they considered all of these various crimes. Certainly the defendant was given no opportunity to defend against any offense other than the one charged in the information.

This question asked by Mr. Evans was not proper cross-examination or competent for any purpose whatever and could have been asked for no other purpose than to implant in the minds of the jurors a suspicion that the defendant was in the habit of molesting young girls on the streets or other places. This constituted misconduct of the grossest character. This question was intentionally injected into the case, charging the defendant with a crime other than the one for which he was on trial, and it became the duty of the trial judge to have declared a mistrial and discharge the jury instanter.

The Constitution of the United States (U. S. C. A. Const. Amend. 6) and of this state (Const. S. D. art. 6, § 7) guarantees a fair trial by a fair and impartial jury to every man accused of crime. Such a trial was not afforded to the defendant in this case. Indeed, it appears from the record that both Mr. Hanson, the state's attorney, and Mr. Evans, the assistant attorney general, who assisted in the trial, seized upon every opportunity that presented itself to bias and prejudice the jury against the defendant. In the case of State v. Perkins, 36 S. D. 579, 156 N. W. 73, 74, the defendant was prosecuted on the charge of receiving deposits in a bank, knowing the bank to be insolvent. In considering the refusal by the trial court, of a motion for a change of place of trial this court say: "The trial of defendant took place in June, 1913. [The bank had closed in 1911.] We are of the view that it was impossible for the excited and inflamed state of the public mind, which appears from the foregoing showing, to have died out or subsided so that it was possible or probable that defendant could have a fair and impartial trial by an unbiased and unprejudiced jury in Meade county. Common human experience teaches us that it takes

years for such bitter public excitement and prejudice to subside. While it must be understood that we make no criticism of any candidate or of any newspaper or any other person's discussion and denunciation of the officials of said bank, as the same might have been justifiable under the facts, still we are of the view that all such discussions and denunciations served to keep alive the bitter feeling of prejudice against appellant existing at Sturgis and throughout said county resulting from the said bank failure. The fundamental laws of our land guarantee to all accused of crime a fair and impartial trial. An excited state of public feeling is always the most unfavorable for an investigation of the truth. Not only should the minds of the jurors be without bias and prejudice, but the minds of the jurors should be as far as possible removed from the prejudice and excitement of others. When public sentiment of a community is strongly aroused against a defendant, its effect is to prevent a calm and dispassionate inquiry into the merits of the controversy. State v. Nash, 7 Iowa 347; State v. Crafton, 89 Iowa 109; 56 N. W. 257; Richmond v. State, 16 Neb. 388, 20 N. W. 282; People v. Suesser, 132 Cal. 631, 64 P. 1095; Jamison v. People, 145 Ill. 357, 34 N. E. 486. If the loss and suffering caused by this bank failure were due to the criminal acts of the officers of said bank, then the officers of such bank, participating in such criminal acts, certainly merit punishment. If, on the other hand, this bank failure was the result of local climatic conditions, drought and crop failures, with no fault on the part of the officials of the bank, then such officials should not be held criminally liable. And, if this bank failure may have been the result of the criminal acts of some of the officials of said bank, other than this defendant, in which criminal acts this defendant took no part as an aider and abettor, certainly justice would not demand that this defendant should be made to suffer for the sins of others. These were issues the truth or falsity of which this appealing defendant had the right to have submitted to calm and dispassionate investigation before an unbiased and unprejudiced jury. From the showing made it appears that the public prejudice against defendant was not confined to any particular locality, but extended and cast its influence over the entire county. We are therefore of the view that it was prejudicial error to overrule appellant's motion for change of venue to some other county."

In State v. Demerly, 56 S. D. 65, 227 N. W. 463, 465, this court without considering the question of change of place of trial says: "Appellant is entitled to a fair trial. An excited state of public feeling is always the most unfavorable for an investigation of the truth. Not only should the minds of jurors be without bias and prejudice, but they should be removed from the bias and prejudice of others."

The case was reversed on other grounds; citing State v. Perkins, supra.

In the case of People v. Pfanschmidt, 262 Ill. 411, 104 N. E. 804, 816, Ann. Cas. 1915A, 1171, the defendant was charged with the murder of four persons and the burning of the building containing the bodies of the four victims. Prior to the trial defendant moved for a change of place of trial. The motion was supported by his own affidavit, that of his counsel and some others. The motion was resisted by the state's attorney whose resistance was supported by the affidavits of 2251 residents of the county. The motion was overruled by the trial court. Defendant was convicted and on motion for new trial defendant urged error in the denial of his motion for change of place of trial. In considering this assignment on appeal the Supreme Court of Illinois says:

"In discussing the statute on change of venue in this class of cases, this court, in Jamison v. People, 145 Ill. 357, 372, 34 N. E. 486, 489, stated: 'Under the statute in relation to changes of venue on account of the prejudice of the inhabitants of the county, * * * the material issue to be tried upon the petition and affidavits filed by the accused and the traverse and counter affidavits filed by the prosecution is whether there is, in fact, a prejudice in the minds of the inhabitants of the county sufficient to raise a reasonable apprehension that the accused will not receive a fair and impartial trial in the county.' Price v. People, 131 Ill. 223, 23 N. E. 639; Hickam v. People, 137 Ill. 75, 27 N. E. 88. An application for a change of venue on account of prejudice is addressed to the sound legal discretion of the trial judge, subject to review in this court. People v. Donaldson, 255 Ill. 19, 99 N. E. 62, Ann. Cas. 1916D, 90; Chicago & A. R. Co. v. Harrington, 192 Ill. 9, 61 N. E. 622; Gitchell v. People, 146 Ill. 175, 33 N. E. 757, 37 Am. St. Rep. 147; People v. Turner, 260 Ill. 84, 102 N. E. 1036 [Ann. Cas. 1914D, 144]. By judicial discretion is meant sound

discretion guided by law. It does not mean an arbitrary discretion. 9 Am. & Eng. Ency. of Law (2d Ed.) 473; 14 Cyc. 384. 'Judicial power is never exercised for the purpose of giving effect to the will of the judge—always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law.' Osborn v. United States Bank, 22 U. S. (9 Wheat.) 738, 6 L. Ed. 204. Deciding what is just and proper under the circumstances of a case is such judicial discretion. In all cases courts must exercise a discretion, in the sense of being discreet, prudent, and exercising cautious judgment. Murray v. Buell, 74 Wis. 14, 41 N. W. 1010; Abbott v. L'Hommedieu, 10 W. Va. 677. A judicial discretion, in practice, is 'the equitable decision of what is just and proper under the circumstances.' 1 Bouv. Law Dict. (15th Ed.) 537; see, also, Black's Law Dict. (2d Ed.) 375; 3 Words and Phrases [First Series] pages 2095, 2098; Trustees of Schools v. School Directors, 88 Ill. 100; 6 Ency. of Pl. & Pr. 819. Abuse of discretion does not mean only the decision of a case by whim or caprice, arbitrarily or from a bad motive (Citizens' St. R. Co. v. Heath, 29 Ind. App. 395, 62 N. E. 107), but it also means that the discretion had not been justly and properly exercised under the circumstances of the case. Murray v. Buell, supra.

"The proper decision of the motion for change of venue cannot be made on the basis of the number of affidavits on each side or by the mere preponderance of the testimony. It was not necessary for plaintiff in error to show beyond a reasonable doubt or by a preponderance of the evidence that he could not receive a fair and impartial trial, but a change of venue should be granted if the showing was such as to raise a reasonable apprehension that he could not receive a fair trial. The statement in the 2251 general affidavits filed in support of the answer of the state's attorney against the change of venue, that the case was exciting no more interest than is usually taken in other criminal cases of like character, must be taken with considerable allowance in view of the record before us."

The showing made by the defendant in this case was sufficient in my judgment to give rise to a reasonable apprehension that he could not have a fair and impartial trial in Miner county. "Not only should the minds of the jurors be without bias and prejudice, but the minds of the jurors should be as far as possible removed

from the prejudice of others." State v. Perkins, supra. The error in denying the change of place of trial is sufficient to entitle defendant to a new trial.

The defendant denied the commission of the offense and denied that he had ever seen Dorothy Forsberg until after he was arrested on the 22d of October, 1937. He denied that he was in Canova that afternoon or any place in Miner county. He testified that on the afternoon of October 13 he was down in McCook county on a business trip as hereinbefore set out. He named five different parties with whom he had transacted business that afternoon, and at the trial these five parties all attended the trial and each one testified that he had seen and talked with the defendant that afternoon, and in fact, completely corroborated the defendant in everything he said relative to their talks with him. They also testified that on that particular afternoon the defendant was clean shaven and neatly dressed; that he did not have two or three days' growth of whiskers on his face nor that he was dressed in old or unclean clothes, as the four high school girls had testified. The defendant was also corroborated by his wife, his two sons and two hired men as to what he did on the afternoon of October 13. Some of these parties testified that they were talking with defendant in McCook county at the very time Dorothy Forsberg said she was being assaulted by defendant in the outskirts of the town of Canova in Miner county. None of these witnesses were impeached or in any manner discredited, but if the testimony of the high school girls were true, then all of these witnesses were guilty of deliberate perjury in everything they said. They were all strangers to the defendant and had no interest whatever in the outcome of the trial other than to truthfully testify as to the matters they knew of their own knowledge.

The witness, Dorothy Forsberg, testified that while she was riding in the car with the defendant and after she said she had been assaulted, the car in which they were riding struck some obstacle in the road by which the car was severly jolted and that from that time on the motor made a loud noise. The witness Zimmerman testified that about a week after the arrest of the defendant he went out to look up the obstacle that had been struck by the car. He testified that at a place just east of Canova he found a stone protruding from the surface of the road; that it was between

the center line of the road and the westerly wheel rut; that it stuck up from the surface of the road to a height of 8 or 10 inches and was firmly imbedded in the soil. It had been there since time immemorial. He guessed that this must be the obstacle that had been struck by the car in which Dorothy Forsberg was riding just after she claims to have been assaulted. The witness said he found chips and particles of metal on the stone. These chips of metal that he found were introduced in evidence at the trial. They were not admissible in the case for any purpose except upon the theory that they had been rubbed or scraped from some portion of the car which the defendant was driving that afternoon; but there is no evidence in the record that shows nor tends to show that any of these so-called particles of metal were rubbed or scraped from any part of the car that defendant was driving on that afternoon. If the car scraped the rock hard enough to rub off chips and particles of metal, so every other car of no greater ground clearance than the car the defendant was driving that afternoon, that ever passed over that road would have struck the rock just as hard and scraped off just as much metal with the result that instead of a few particles of metal barely visible to the naked eye that was said to have been found by the witness, there would have been literally bushels of metal piled up around the rock. The witness who produced this evidence did not claim that any of it had been rubbed off any part of the car in which the witness, Dorothy Forsberg was riding, or from the car driven by the defendant, and that he took to a garage for repairs in Madison on the 14th day of October, 1937. The witness who produced this evidence in court testified relative thereto as follows: "The road where the rock is located is a section road open to the public and it is possible that between October 13 and October 21, 1937, several cars could have passed over that rock and it is also possible that farm vehicles and other vehicles might have passed over that rock and it is also possible that the pieces of metal I picked up might have been chipped off from a harrow or disc or any other implement that was made of steel or metal or from the axle of a car."

This evidence was not admissible under any circumstances whatever unless it was shown to an absolute certainty that it had been rubbed off the car the defendant was driving on the afternoon of October 13, 1937 and by its admission in evidence the court

told the jury that the so-called particles of metal had been rubbed off the car defendant was using that afternoon; the fact is however that there is not a scintilla of evidence in the entire record that shows or tends to show that any of these so-called particles of metal were rubbed or scraped from any part of the car in which Dorothy Forsberg was riding that afternoon, nor is there a scintilla of evidence in the record showing that any of such particles were rubbed or scraped from any part of the car that the defendant took to a garage in Madison for repairs on the 14th of October.

On the day of the defendant's arrest he was questioned by the witnesses, Zimmerman, Olson and Collins, as to where he had been on the 13th of October and how he had injured his car. The defendant told them that on his return from McCook county on that afternoon he had driven through the fence and into his farm at a place some half a mile distant from the usual entrance; that he did this because some of his cattle were in the field and he drove through the fence in order to drive them home. He said that in driving the car along the fence line in the field he crossed a small swail. This was covered with grass and there were some trees and rocks there also. He said that while driving through this grass his car struck a rock and broke the distributor of his motor and that there was considerable noise caused by the exhaust. This was some six miles from Madison and he asked these officers to take him out to that particular place and he would show them just how and where he had injured his car. This they refused to do and Zimmerman told the defendant, "You are guilty!—guilty as hell, and I know it," and immediately thereafter took defendant to Howard in Miner county and locked him up in jail. At the trial the witnesses, Olson and Zimmerman testified that some time after the defendant had been taken to jail, they went out and looked for the place described by the defendant; but their testimony relative to this trip, on this particular point, is so vague and uncertain that it cannot be ascertained from such testimony whether they went to the place indicated by the defendant or not. But neither of them testified that the place and the stone were not just as the defendant had described them to be.

It is quite unfortunate that these officers followed the course they did in regard to this particular matter for had they gone with the defendant to the place where he said he injured his car, and

found the condition there as he said it was, it would have been a strong circumstance in favor of the defendant at the trial; on the other hand, if they had found the conditions were not as the defendant said they were, it would have shown he was not telling the truth and would almost completely have discredited him as a witness.

Because of the many errors occurring at the trial, the judgment appealed from ought to be reversed and a new trial awarded.