STATE, Respondent, v. RASCH, Appellant

(19 N. W.2d 339.)

(File No. 8772. Opinion filed June 26, 1945.)

Rehearing Denied Sept. 12, 1945.

**William J. Holland,** of Sisseton, and **Danforth & Danforth,** of Sioux Falls, for defendant and Appellant.

**Frank S. Tait,** State's Atty., of Milbank, **George T. Mickelson, Atty. Gen.,** and **Charles P. Warren,** Asst. Atty. Gen., for plaintiff and Respondent.

RUDOLPH, J. The defendant was convicted in the Circuit Court of Grant County of the murder of James Gaunt, a young man 21 years of age whose home was in Connecticut. The jury recommended life imprisonment and the defendant appeals from the judgment based upon the jury's verdict. The evidence connecting the defendant with the murder is entirely circumstantial. The body of James Gaunt was found along the north side of the tracks of the Milwaukee railroad at a point about 1½ miles west of the town of Warvin in Grant County on the afternoon of August 25, 1943. The body was lying with its head toward the tracks about three feet from the end of the cross ties. It was lying in weeds and grass which were from 15 to 18 inches high. The body was discovered by an engineer on a west bound freight train who notified the authorities at the town of Summit who arrived at the place where the body was found about 6 o'clock P. M. of August 25th. The body bore a bullet wound on the head which indicated the bullet had entered on the right side of the jaw and made its exit on the back of the head. There was a smear of blood and brain matter on the ground under the head and the body was dirty and covered with blood with a few minor skin bruises appearing thereon. At the time the body was found rigor mortis had set in and various witnesses attempted to describe the position of the body when it was first observed. Much of this testimony with reference to the position of the body was by demonstration and it is difficult to get a picture of the exact condition. For example one witness was interrogated as follows:

"Q. Was the left side of the head of the body resting on the left arm? A. I wouldn't say.

"Q. Was the head of the body lying like this? A. The right arm was in that position.

"Q. Was the right arm in this position on the body? A. No, sir.

"Q. In which position was the right arm on the body? A. The right arm was folded.

"Q. Against the body like this? A. No, up a little higher.

"Q. About like this then? A. Like this."

This type of testimony continued for several pages of the settled record. However, we believe it a fair statement of the record to say that at the time the body was found it was lying with the left side of the face resting on the left arm or shoulder and the left arm was flexed at the elbow and extended somewhat upward. The right arm was lying against the body and both legs were somewhat flexed at the knee joint. The day was foggy and misty and the weeds and grass around the body were damp and gave no indication of anyone having been in the vicinity of the body prior to the time it was found. The pockets of the dead man's trousers had been turned inside out and there was nothing found in any of the pockets of his clothes. Subsequently, however, there was discovered a money belt strapped around the upper portion of the body underneath the clothes which contained four ten dollar bills and some papers which lead to the identification. During the day of August 25th several trains passed over the tracks adjacent to the place where the body was found as did also the section crew riding on an open motor car but it was not until late in the day that the body was observed by the engineer as referred to above.

The defendant first appears in connection with this crime at Montevido, Minn., at about 6:30 P. M. on August 24th at which time a freight train was making up to depart from this station. At Montevideo this train was checked by an inspector who observed the body of a bus loaded on one of the freight cars. This bus body was of peculiar construction. A picture of the bus is inserted:

The doors on the bus were closed and to enter it was necessary to climb through one of the openings which are referred to in the testimony as windows. However, there were no glass windows in the bus, except in the front. This inspector entered this bus body by "crawling over the window in the door". Sitting in one of the seats was the young man whose body was subsequently found as above described. The inspector asked this boy for his draft card and the boy produced a billfold from which he took the draft card showing him to be classified as 4-F. In this bus the inspector discovered a suitcase which he started to open but was advised by the boy that the suitcase belonged to a traveling companion who had left the train to get a drink of water. Nevertheless, the inspector opened the suitcase and found therein an army uniform and other personal effects. After leaving this bus the inspector walked on

along the train and met the defendant who was walking toward the bus. He asked the defendant his name and questions concerning his draft status. The defendant produced an honorable discharge from the army. Defendant also stated that the suitcase in the bus belonged to him. Defendant was wearing civilian clothes of rather a light color. From the testimony it appears that the deceased had left his home bound for Seattle, Washington, where he hoped to secure employment in a defense plant. The defendant had left his home in Wisconsin either for the purpose of going to Aberdeen to follow the harvest, as he stated to the inspector at Montevideo or to Montana to obtain work as a sheepherder as indicated by witnesses for defendant. This freight train left Montevideo at 8:30 o'clock P. M. and arrived in Milbank, South Dakota, at 10:10 o'clock P. M. where it remained for two hours. The train left Milbank at 12:15 o'clock A. M. on the morning of August 25th and arrived at the point where the body was found about 1:53 o'clock A. M. that morning, about an hour and thirty minutes after leaving Milbank. At the time the train passed the point where the body was found, it was traveling about 10 miles per hour. This train did not stop between Milbank and Aberdeen where it arrived at 4:25 A. M. As the train was leaving Milbank two employees of the railroad company observed this bus body and one testified that he observed two men in the bus, the other on direct examination testified he also observed two men but upon cross examination said two or three. A train inspector who inspected the train upon its arrival at Aberdeen testified that he observed this bus on the freight car and that on the north side of this bus he noticed blood stains but that he did not go into the bus. The blood stains were below one of the openings toward the west end. After the body of the deceased was found the car carrying the bus was ordered set out at Deer Lodge, Montana where an inspection was made disclosing that on a cushion in the rear end of the bus and under the cushion there was blood. A pair of glasses were found in the bus which were identified as glasses belonging to the deceased. The lead bullet of a 38 caliber cartridge was also discovered in the bus.

After being seen at Montevideo the defendant was next seen at O'Neill, Nebraska, a day or two following August 25th, where he appeared in his army uniform, which was described in the evidence as being wrinkled. It appears from the evidence that a bus leaves Aberdeen for O'Neill, Nebraska, at 7:30 o'clock in the morning. At O'Neill the defendant obtained a ride west on a truck. A witness who talked with the defendant at O'Neill testified that the defendant stated he wished to catch a ride west because he was without funds to ride the train.

The defendant was located by the authorities of Grant County working on a sheep ranch near Lander, Wyoming. Defendant arrived in Lander about August 29, 1943. He was acquainted in this vicinity and had worked there at various times since 1935. Defendant was arrested at Lander on December 14, 1943, and while held there in jail wrote a letter to his brother in Wisconsin as follows:

"Dear Brother.

"Im in Jackpot and any body asking about me or any think of mine tell them to go to hell and tell the rest.

"Your loving brother,

"Selmer

"P. S. Please burn all my letters you got from me and regardless of what they say I said."

After being returned to South Dakota the defendant made a statement related in the evidence as follows:

"* * * he said he met young Gaunt down the line in a small town and they rode on the freight train together, and Mr. Tait asked him if he stayed with Gaunt after he left Montevideo and he said he didn't remember what became of him but he stayed on the train until he got to Aberdeen, and Tait asked him how he left Aberdeen and he said he didn't know exactly whether by bus or hitched-hiked but he thought by bus but he went to O'Neill, Nebraska, and from their he went to Lander, Wyoming."

The record is voluminous, but we believe the above is a fair statement of the substance of the testimony upon which the conviction was based. The defendant did not take the witness stand to refute or explain any of the testimony

offered by the state and the facts are virtually without dispute.

■ The trial court correctly instructed the jury regarding the rule relating to circumstantial evidence as established in this state. State v. Guffey, 39 S. D. 84, 163 N. W. 679; State v. Clark, 46 S. D. 490, 194 N. W. 655; State v. Ferguson, 48 S. D. 346, 204 N. W. 652; State v. Guffy, 50 S. D. 548, 210 N. W. 980; State v. Thieme, 54 S .D. 611, 224 N. W. 228; State v. Dean, 60 S. D. 280, 244 N. W. 354; State v. Henzlik, 60 S. D. 299, 244 N. W. 346; State v. Czerney, 61 S. D. 172, 247 N. W. 376; State v. Schelske, 64 S. D. 574, 269 N. W. 81; State v. Giffen, 64 S. D. 430 267 N. W. 229.

The trial court instructed the jury as follows:

"* * * the state must not only show beyond a reasonable doubt that the alleged facts and circumstances are true, but they must be such facts and circumstances as are absolutely incompatible upon any reasonable hypothesis consistent with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the accused, * * *"

The evidence must be considered in conformity with this instruction. The evidence is amply sufficient to sustain the jury finding beyond a reasonable doubt that Gaunt was shot and killed while in the bus, and that the body was thrown from the train at the point it was found. The fact that the body was not discovered until after several trains and the section crew had passeed the location is readily explainable by the weeds and grass surrounding the body, and in any event, not so compelling, in view of all the evidence, that this court should hold as a matter of law that it raised a reasonable doubt as to the body being thrown from the train as contended by the state. Established, therefore, is the fact that Gaunt was murdered while in the bus, and the murderer threw the body from the train. Established also is the fact that the deceased and the defendant were the passengers on this bus, and except for the testimony on cross examination, when the witness said "two or three", the evidence discloses only two people in

the bus. In view of the positive testimony of the preceding witness, and in view of the entire absence of any other testimony placing any one in the bus other than the deceased and the defendant, this statement made upon cross examination is not entitled to the probative weight accorded thereto by appellant. We believe the entire evidence amply justifies a finding by the jury that deceased and defendant were the sole occupants of this bus when it left Montevideo, and that they were the occupants of the bus as it left Milbank. The inspection at Montevideo disclosed no riders on the train other than the two men involved, nor did the inspection at Aberdeen. In this connection also must be considered the statement of the defendant wherein he stated he rode on the train with Gaunt, but mentioned no other riders. In the absence of explanation the conclusion seems irresistible, therefore, that it was the defendant who shot and killed Gaunt as they were riding in this bus.

Appellant suggests that the evidence fails to disclose any motive for the crime. Motive, of course, is not an essential element of the crime but the record fairly discloses that there was the motive of robbery. The deceased's pockets were turned inside out, and his billfold had disappeared. There was no money found on the deceased except that in the money belt hidden underneath the clothes. Appellant further suggests that the actions of defendant after leaving Aberdeen fail to show a guilty conscience, but it is undisputed that appellant before arriving at O'Neill had changed his clothes to the Army uniform, and no offer was made to produce the clothes he wore when seen at Montevideo. We have gone over the transcript of the evidence with care, and can conclude only that there is nothing upon which this court can hold that the jury was not justified in finding from the evidence beyond any reasonable doubt the ultimate fact of defendant's guilt.

Appellant urges that there was a failure of proof to establish the venue in Grant County. The trial court instructed the jury that the proof must show beyond a reasonable doubt that the crime was committed in Grant County. While this instruction was a part of a general instruction on

the degree of proof required, we hold that it was sufficient and that a separate instruction on venue was not necessary. This court has never definitely held that venue should be proved beyond a reasonable doubt, but where it is claimed, as it is in this case, that the proof fails to show the commission of a crime in this state we believe such proof is required. The Louisiana court in the case of State v. Jackson, 142 La. 540, 77 So. 196, 198, L. R. A. 1918B, 1178, by apt language states the reason for this requirement, we quote:

"It is clear, therefore, that in order to secure a conviction in a criminal prosecution it is necessary to show not only that the act denounced as a crime has been committed, but that it has been committed within the territory where the law invoked for its punishment prevails, and that from a legal point of view the one factor is as much an ingrdient of the offense, and bears as directly upon the question of the guilt or innocence of the accused, as the other. Where, however, an act, otherwise falling within the definition of a crime, is committed within the boundaries of a state whose state-wide law penalizes it, it is equally a crime whether committed in one part of the state or another; and, though the law may provide for its prosecution in the particular county or parish where committed, the question, whether it was committed in the one county or parish or the other, is one which concerns merely the place and tribunal in which the prosecution is to be conducted, and in no manner affects the question of the guilt or innocence of the accused."

Grant County, where venue was laid, borders on Minnesota, and it is essential, therefore, in this case that the evidence establish beyond a reasonable doubt as required by the trial court that the crime was committed after the train reached the South Dakota line. We are convinced that the evidence meets this requirement. It would be unreasonable to believe that defendant killed Gaunt in Minnesota and stayed on the train thereafter for several hours with the body. Equally unreasonable would be the presence of two men in the bus as the train left Milbank if the dead body was then in the bus. The blood appearing on the outside of the bus under the window where the body was apparenly thrust from the train, and the blood and brains found

under the head of the deceased, indicate quite clearly that the body was thrown from the train shortly after the murder, and in effect dispel any suggestion that the deceased was killed several hours before and while in the state of Minnesota. Appellant contends that from the position of the body when found it must be concluded that rigor mortis, which occurs from four to six hours after death, had set in before the body was thrown from the train. We have read and re-read the evidence which it is claimed supports this contention. The evidence, to say the least, is not satisfactory and the doctor who was called as an expert readily admitted that it would be difficult to prophesy or know the position a limp body would take before rigor mortis set in after being thrown from a moving train into the weeds and grass along the right-of-way. We set forth some of the doctor's testimony:

"Q. If that body landed on its side would the knees contract some? A. Yes.

"Q. Assuming it was limp when it landed, the knees would contract some in the position Mr. Lowe was on the table? A. Yes, they would.

"Q. The knees would contract? A. Yes, they usually do.

"Q. The body flexed at the wrists? A. Yes, and at the elbow.

"Q. If the body happened to land on the ground in this position it would be flexed at the elbow, it would pull it up this way? A. It probably would.

"Q. Assuming that the body was limp and landed with its head upon the arm to the ground it would flex at the elbow and wrist, that would pull it in the position Mr. Lowe was on the table? A. I would say it might."

Giving full effect to the safeguards thrown around a defendant charged with crime by the degree of proof required and the rule as to circumstantial evidence, we conclude that the evidence supports the verdict of the jury.

The judgment appealed from is affirmed.

All the Judges concur.