STATE, Respondent v. NELSON, Appellant

(129 N.W.2d 54)

(File No. 10107. Opinion filed June 16, 1964)

**Roubideaux, Poches & Reade,** Fort Pierre, for Defendant and Appellant.

**Frank L. Farrar,** Atty. Gen., **Robert A. Miller,** Asst. Atty. Gen., Pierre, **David F. Sieler,** State's Atty., Rapid City, for Plaintiff and Respondent.

BIEGELMEIER, P. J. Defendant appeals from a sentence of life imprisonment entered on a jury verdict finding him guilty of murder.

■ At the close of the evidence on behalf of the state and again at the close of all evidence, defendant made a motion to direct the jury to return a verdict of acquittal, which the trial court denied. Upon appeal the correctness of this motion may be reviewed. SDC 1960 Supp. 34.3650. See also SDC 1960 Supp. 34.4109 and State v. Davis, 77 S.D. 87, 86 N.W.2d 174. The insufficiency of the evidence to justify the verdict is thus presented. SDC 1960 Supp. 34.4002(7).

■ When the state has introduced evidence upon which, if believed by a jury, they may reasonably find the defendant guilty of the crime charged, the state has made out a prima facie

case, and the jury, not the judge, ought to pass upon it. State v. Bates, 76 S.D. 23, 71 N.W.2d 641. The facts, as presented by the state on this record and which the jury believed, show a sordid, if rather crude, murder. It is without dispute William Reed Judson, about 21 years of age, died as a result of a gunshot wound caused by a bullet fired from a .22 caliber rifle. The wound was inflicted in a Rapid City motel apartment occupied by defendant. Whether Judson shot himself as mainly contended by accident, or by design to commit suicide as faintly mentioned in the trial court and repeated here, or was wilfully and feloniously shot and killed by defendant was the disputed issue.

Defendant is a 22-year-old carpenter, who worked with his father building houses; he had been so engaged for about five years, about the length of time he knew deceased, who was an inventory clerk. They were the best of friends, saw each other three or four times a week and had roomed together for some time before defendant's marriage. The association and apparent friendship continued until Judson's death on the night of January 22, 1963. That evening defendant, his wife and child ate supper at the home of William Birnbaum, defendant's uncle by marriage; after this they attended a birthday party for his wife's father and returned to the Birnbaum home about 10:00 p. m. There is some variance of what occurred thereafter. The testimony was defendant and Birnbaum returned to defendant's motel apartment. On the way there defendant bought a quart of whiskey. After defendant phoned deceased, who was playing cards with his girl and another couple, defendant and Birnbaum drove to deceased's home and brought him back to the motel. Drinks were mixed and consumed in varying amounts as the three ate lunch, sat around talking and drinking. About 1:30 or 2:00 a. m. they went out for coffee and more mix and back again to the apartment. Birnbaum testified he went to sleep in the bedroom; later defendant wakened him saying "something happend to Bill". Judson lay bleeding and dying on the couch. He died about twelve hours later never regaining consciousness. Defendant testified deceased was sitting on the couch, reached around for the rifle standing nearby, that he warned deceased not to mess with the gun, it might be loaded, the gun went off, defendant did not see this as he was reaching for a drink and that Birnbaum was sitting on a chair nearby.

This bare outline of what occurred that night is more plainly put in focus by other evidence. About two months prior thereto, on November 16,1962, defendant and deceased each made application for $25,000 life insurance, with so-called double indemnity or $25,000 additional payable in the event of accidental death. The applications requested, and the policies thereafter separately issued named defendant Nelson's wife as beneficiary in his policy and deceased Judson's father as beneficiary in his policy. Prior to the application date, defendant had made the appointments and arrangements with the insurance agent and on the date the applications were made defendant paid the first monthly premiums on both policies in cash. About December 10, 1962 Nelson and Judson discussed the policies with the insurance agent, saying they had a partnership in mind. Changes were then made whereby Judson became the beneficiary and owner of the Nelson policy and defendant Nelson became the beneficiary and owner of deceased Judson's policy. Defendant also paid the second monthly premiums due on both policies and they were delivered to him, Judson not being present. These transactions ran on into the middle of January, 1963. The policy on Judson's life was valid insurance to pay defendant Nelson $25,000 plus $25,000 in the event of Judson's accidental death. It had a grace period clause of 31 days which continued the insurance as effective on Judson's death and some twenty days thereafter.

We turn now from this statement of facts to dispose of defendant's separate claims of insufficiency of evidence, even though it interrupts the train of events. Defendant states there is no credible evidence to show defendant knew or thought he stood to gain $50,000 upon Judson's death. As indicated the policies so stated, and they were read and explained to defendant, changed at his request and with his approval, and delivered to him. The insurance agent testified he did not tell them they had to see an attorney to put the insurance in effect as the insurance was in effect when approved by the company. Another witness testified that two days after the shooting defendant was asked if it wasn't true they held $25,000 double indemnity policies on each other and defendant had something to gain by the death of Judson and he replied: "That's true". At the trial defendant admitted the insurance was good when he took it out. That defendant testified

otherwise as to his knowledge or belief of its validity on Judson's death or on other matters is no basis for argument here as this court on appeal cannot disturb a verdict based on conflicting evidence. State v. Dale, 66 S.D. 418, 284 N.W. 770.

Richard Harmon, a close friend of defendant who was in fact a hostile state witness, confirmed defendant's knowledge of the insurance and of the defendant's plan to collect the life insurance on his friend. This witness testified he and defendant were walking in the woods in the latter part of November, 1962; defendant asked the witness "what would you do for $15,000?" to which witness replied "Most anything, it depends on what it is." Later defendant told this witness that Judson and Nelson had some insurance; a month later Harmon asked if he still had the insurance and defendant said "Yes," it was "twenty-five thousand and double indemnity." A third conversation was on the Sunday before Judson was shot. Defendant stated he still had the insurance and the amount. Defendant told Harmon, "Judson was going to commit suicide, and I told him if he did get some insurance money for it, what would stop me from blackmailing him." As to this conversation the witness showed great reluctance to testify as defendant was a "close friend," the best friend he had. He finally did testify that on this Sunday, January 20, 1963:

"He (defendant) told me if I would go out with him, and Bill (Judson) would commit suicide, * * * they would go up to his apartment, and he would buy a bottle, and something would happen to Bill. * * * He told me * * * he would make it worth my while."

Witness Birnbaum after relating facts heretofore stated testified that before attending the birthday party that evening, he and defendant had the following conversation in the car:

"A. Jim (defendant Nelson) told me that he wanted me to do something for him and that I could make some money. He said that Bill Judson was supposed to meet him at his apartment at 10:30 that same evening, and he said that we would buy a bottle and go up there and talk this deal over. He said that he thought I was the kind of guy that wouldn't tell anybody, and I said, 'Tell

who? And he said, 'Oh, people, maybe the cops.' And
he told me that Bill had said to him that he was planning
on—well, he said that Bill was spreading it around that
he was going to commit suicide, and he said that Bill
told him that if he would pay for the insurance that Bill
would take out the insurance naming Jim as the bene-
ficiary, and he said that he would give me $5,000. He
said that the insurance policy was for $28,000, and he
said that $23,000 would be plenty of money for him, and
he told me to ask Diane, my wife, if it would be all right
if I went up there with him, and me and him and Bill
would talk it over, and he said that if he didn't pay me
the money that I could be sure to get it because I could
black mail him, and he said I would be crazy if I didn't.
We went—that's when we went in the house.

"Q. Then to the best of your recollection was that as
much of the conversation as you can recall?

"A. Well, he said, while we was talking, he said
that—while we was talking at the apartment—if I didn't
want to see what kind of a guy he was that he would
give me a look or something, and I could go into the bath-
room or bedroom and he would tell me when I could
come out."

After the party, they went to defendant's apartment; defendant
phoned Judson, they drove to his home to get him; the three re-
turned to the apartment, visited, ate and drank liquor. It also ap-
peared Judson had just gotten out of the hospital a few hours
before defendant picked him up that evening. In the conversa-
tions with Birnbaum and defendant in the apartment that eve-
ning, deceased mentioned being in the hospital the night before
and said he had passed out or something and they didn't know
what was wrong with him, that "they thought maybe it was when
—he said to Jim, (defendant) he said, 'They thought maybe it's
where you knocked me in the head.' "

(Defendant testified deceased and Birnbaum drank enough
to become intoxicated, but he didn't as he was not much of a
drinker.) Later Birnbaum went into the bedroom and was asleep

when defendant wakened him. He saw deceased lying on the couch and the rifle on the floor. He testified he had seen no rifle in the apartment previous to coming out of the bedroom after the shooting. He tried to use the phone to call the police or an ambulance, but at this hour—around 3:40 a. m.—the motel phone did not operate, so they ran outside and knocked on the manager's door with no response. Defendant asked Birnbaum:

> " 'What are you going to tell them?' I said, 'I'm going to tell them I was sleeping in the bedroom.' And he said, 'No, you can't tell them that, you have to tell them you was setting in the chair, and that Bill picked up the gun and it went off accidentally.' And then he said, 'I shot him.' "

The witness drove defendant's Thunderbird car to a nearby service station to reach a telephone. There the witness gave different versions of what happened at the motel, i. e.: they weren't in the room when Judson was shot; they were struggling to take the gun from him and they told him to lay it down as it was loaded. A written statement given at the police station by both Birnbaum and Nelson gave the "not to mess with the gun" version. Three nights later Birnbaum changed his story to the version thereafter relating in court. Defendant returned to the apartment. When the police and ambulance arrived Judson was lying unconscious on the floor with the rifle partly under him with a bullet wound between his eyes. He never regained consciousness. The rifle bore no fingerprints. It was the state's theory defendant shot Judson as he lay on the couch intoxicated or asleep.

■ ■ Credibility of the witnesses and weighing of the evidence was for the jury. State v. Bates, 76 S.D. 23, 71 N.W.2d 641. It would unduly lengthen the opinion to further state other evidence in the record that amply supports the verdict, such as the expert evidence as to the course of the bullet into the skull and the angle of the rifle when fired between deceased's eyes. The jury could consider the probability or improbability of the claimed partnership cattle feeding business venture and the arrangements for it and the insurance, as well as the nearly all

night meeting with Judson. These were matters resting in the main on defendant's claimed conversations with deceased alone which could not be rebutted.

■ This recital of the evidence disposes of the other claims of prejudicial error as to the references to insurance in the prosecution's argument to the jury. No objection was made to these arguments, so defendant may not now complain. State v. Husman, 66 S.D. 530, 287 N.W. 30. However, the arguments were supported by the evidence and fair comment thereon.

· ■■ It is finally urged the court erred in failing to instruct the jury pertaining to motive—the insurance policy proceeds. No objection was made in the trial court as to the instruction on the charge of murder; the court gave the two requested by defendant and the only exceptions were to three instructions with reference to submission and the definition of manslaughter, not here pertinent or argued. Defendant admits the record does not disclose a request to instruct on the subject of motive or any objection for failure to do so. Motive is not an essential element of the crime of murder, State v. Rasch, 70 S.D. 517; 19 N.W.2d 339, though the record here shows the motive was the vain hope of quick riches, the recovery of the insurance money. The elements of the crime having been fairly covered by the instructions, defendant cannot, by failure to request the instruction, thereafter complain. SDC 1960 Supp. 34.3651 states the trial court, in instructing the jury "must state to them all matters of law which it deems necessary for their information in giving their verdict." This statute is discretionary in nature and in the absence of proper request, it has been held not reversible error for the trial court's failure to instruct on the weight of circumstantial evidence where the conviction rested entirely on such evidence. State v. Flack, 77 S.D. 176, 89 N.W.2d 30. Nor was it error here. A similar result was reached as to accomplice and alibi issues in State v. Glass, 29 N.D. 620, 151 N.W. 229. Defendant cites State v. Lancaster, 167 Ohio St. 391, 149 N.E.2d 157, 71 A.L.R.2d 1017, and note page 1025 in support of his contention. In the Ohio opinion a request for the motive instruction was denied. That court affirmed, and quoting an earlier opinion said:

"Motive is not an element of the crime of homicide required to be established to warrant a conviction. Proof of motive does not establish guilt, nor want of proof of motive establish innocence."

It may well be that defense counsel in the instant case, (who was not the counsel appearing in this court on appeal) concluded not to request such an instruction, for the reason so aptly stated in the Ohio Supreme Court opinion, supra, "Therefore, a charge on motive, such as requested by defendant's counsel, could have only injuriously affected the defendant, and, assuredly, it was not prejudicial to him for the court to have refused it."

In accord with the policy of other courts, (see State v. Glass and State v. Lancaster, both supra) and in view of the importance and seriousness of this case, we have read the entire record and carefully examined the claimed errors and come to the conclusion defendant had a fair and impartial trial, he was defended by competent and experienced counsel and nothing occurred therein which warrants reversal of the judgment.

Affirmed.

All the Judges concur.