# STATE v. JERRY H. CAMPBELL.

161 N. W. (2d) 47.

July 12, 1968—No. 40,402.

*C. Paul Jones,* State Public Defender, and *Ronald L. Haskvitz,* Assistant State Public Defender, for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* Assistant County Attorney, for respondent.

PETERSON, JUSTICE.

Defendant, Jerry H. Campbell, was tried in Hennepin County District Court without a jury [1] and convicted of the crime of murder in the first degree for the shooting death of one Wilford Hanson in the course of an armed robbery of Hanson's Super Fair Store in Minneapolis on October 21, 1965.

Defendant appeals from the judgment on the following grounds:

(1)    A warrant was issued by the magistrate for the search of his apartment without sufficient evidence to establish probable cause, as required by the Fourth Amendment.

(2)    The taking of a blood sample from defendant without a warrant was, in the circumstances surrounding the taking, a violation of his rights guaranteed by the Fourth Amendment.

(3)    The evidence, regardless of admissibility, was insufficient to sus-

---

[1] Defendant executed a written waiver of trial by jury pursuant to Minn. St. 631.01. In addition, both the court and his own counsel questioned defendant at length to be assured that he understood his constitutional right to jury trial. At no stage in the trial did defendant indicate any dissatisfaction with the choice he had made. Defendant now challenges the effectiveness of his written waiver of trial by jury. There is no basis whatever for defendant's claim that his waiver was not made knowingly and voluntarily.

tain a conviction of murder in the first degree, as distinguished from murder in only the third degree, because there was no proof of the essential element of premeditation and intent to effect the death of his victim.[2]

A preliminary statement of the facts surrounding the homicide is necessary to a consideration of all three issues presented. An armed robber entered Hanson's Super Fair Store at 4245 Fourth Avenue South, Minneapolis, shortly after 9:30 p. m. on October 21, 1965. The robber was masked by a paper bag in which openings had been torn for the eyes. He was wearing dark trousers, a striped shirt, and "scuffed and tie shoes" that were "kind of pointed." He was about 5 feet 10 inches in height and had black hands, from which it appeared that he was a Negro. He "sounded kind of young." The store's cashier thought he was "the same person that had robbed our store about a week before."

As he entered from the front of the store, the masked robber confronted the cashier, a woman, and stated: "This is a stick-up. I've got you again." The cashier turned toward the cash register, but the robber motioned her away with his gun and said: "I want you in the back room * * * I want the old man." Defendant ordered her and three other persons to the butcher shop area at the rear of the store. Decedent, a man answering the description of the "old man," was there engaged in the process of cutting meat and held a boning knife in his hand. The robber approached to within 6 or 7 feet of the decedent. The

---

[2] Minn. St. 609.185 provides in part: "Whoever does either of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:

"(1)   Causes the death of a human being with premeditation and with intent to effect the death of such person or of another; * * *."

Minn. St. 609.195 provides: "Whoever, without intent to effect the death of any person, causes the death of another by either of the following means, is guilty of murder in the third degree * * *:

\*     \*     \*     \*     \*

"(2)   Commits or attempts to commit a felony upon or affecting the person whose death was caused * * *."

Minn. St. 609.18 provides: "For the purposes of sections 609.185 and 609.19, 'premeditation' means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission."

robber said to decedent: "I got you this time." The robber held his gun just in front of him, close to his face, pointing toward decedent "like he could see what he is shooting at." Decedent said in substance: "Don't I know you?" The robber said to him: "Throw down the knife, Mr. Hanson." Decedent instead threw the knife at the robber, wounding him in the chest. The robber fired two shots. One shot struck the ceiling, but the other shot, according to the testimony of a pathologist, struck decedent between the eyes and entered his brain, a mortal wound.

After the shooting the robber ordered the cashier to give him the money from the cash register. He then fled, going out the front door, across the adjacent parking lot, and toward the alley behind the store. Police officers found his paper mask in the alley behind the store, about three houses to the north. A search of defendant's apartment in the early hours of the following day resulted in the seizure of these items of real evidence used against defendant at trial: Pieces of paper matching the paper tear-out portions of the paper mask used by the robber; blood-stained clothing answering eyewitnesses' description of that worn by the robber, including shoes, trousers, and a shirt having a cut in the front; and the gun identified by the state's firearms expert as that used in the crime.

Detectives Robert D. Anderson and Aloysius Pufahl of the Minneapolis Police Department Homicide Division, who were in charge of investigating the crime, were led to defendant as the murder suspect when Hennepin County General Hospital authorities informed them that a Jerry Campbell, who "had given the address of 4015 Fourth Avenue South, Apartment 5, as his residence," had been admitted to surgery with a stab wound in his upper stomach. That apartment was located just 2½ blocks from Hanson's Super Fair Store. It was established that the defendant had gone to the apartment, which he shared with one Philip Graves, and there changed his clothing. At about 9:50 p. m. he went to the residence of an acquaintance, one Ronald Sims, at 3947 Fifth Avenue South, less than a block from his own apartment, and Sims took him to Hennepin County General Hospital. Defendant had told Sims that he had been stabbed by "four guys in the alley there between Fourth Avenue and Fifth Avenue." Sims observed, however, that there was

no blood on defendant's clothing and, as he told the police who interrogated him shortly thereafter, he saw no "penetration holes" in defendant's shirt and sweater. Sims gave the police defendant's approximate address.

Detectives Anderson and Pufahl had been assigned to the case at 10:30 p. m. They first went to the store and interrogated the eyewitnesses and other police officers who had gone to the scene immediately after the crime. They then went to the General Hospital at about 10:40 p. m. but were unable to interrogate defendant because he was unconscious and in surgery. They noted from the hospital records that defendant had been admitted at approximately 10 p. m.

Detectives Anderson and Pufahl then made a check of defendant's police record from which they learned that a Jerry Campbell had been arrested in Minneapolis in August of 1965 on a fugitive warrant from Waterloo, Iowa, for robbery of a grocery store; Campbell had been returned to Iowa authorities but was currently out on $5,000 bond; and police authorities of Waterloo had requested surveillance of Apartment 5, 4015 Fourth Avenue South because they claimed to have evidence that these premises were "a gathering-place of certain holdup men." The detectives thereafter procured a warrant for the search of defendant's apartment.

Detective Russell Krueger and another detective subsequently went to General Hospital on the morning of October 22, the day after the murder, and obtained a sample of defendant's blood. A blood analysis revealed that his blood was of the same blood grouping as that found on the robber's abandoned paper mask and on the shirt and trousers seized in defendant's apartment.

■ The search warrant under which the police searched defendant's apartment was granted by Judge Elmer R. Anderson of the Hennepin County Municipal Court at his home at about 1 a. m. on October 22, 1965. Detective Anderson made the application, supported by an affidavit stating in part:

"* * * [T]he facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows: Robbery and homicide oc-

curred at 9:50 p. m. October 21, 1965, at Hanson's Super Fair 4245 4 Ave. So. Suspect of homicide was stabbed and fled. Within one hour, one Jerry Henry Cambell [sic] was admitted to General Hospital with a stab wound. Campbell lives within two blocks of scene. Has criminal record for robbery. Cambell [sic] admits being stabbed in this area."

The affidavit contained, in addition, the following explicit description of the premises to be searched and the property to be seized:

"* * * [H]e has reason to believe, and does believe, that on the premises known as 4015-4 Ave. So. Apt. 5 in the City of Minneapolis, Hennepin County, there is now being concealed certain property, namely: one 32 automic [sic] pistol

Currency and coin not to exceed $500

Men's clothing consisting of one man's sport shirt of blue, gray and reddish color, dark pants

Torn pieces of paper bag which was used as mask."

Defendant contends that this affidavit was fatally defective because it did not conform to constitutional and statutory requirements [3] that

---

[3] U. S. Const. Amend. IV provides: "The rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Minn. Const. art. 1, § 10, is virtually identical. The Fourth Amendment, moreover, has been made applicable to the states by the Fourteenth Amendment. Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. ed. (2d) 1081; Ker v. California, 374 U. S. 23, 83 S. Ct. 1623, 10 L. ed. (2d) 726; Aguilar v. Texas, 378 U. S. 108, 84 S. Ct. 1509, 12 L. ed. (2d) 723.

Several statutes prescribe the method for obtaining a search warrant in this state. Minn. St. 626.08 provides: "A search warrant cannot be issued but upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property or thing to be seized, and particularly describing the place to be searched."

§ 626.09 provides: "The court or justice of the peace may, before issuing the warrant, examine on oath the person seeking the warrant and any witnesses he may produce, and must take his affidavit or their affidavits in writing, and cause same to be subscribed by the party or parties making same."

search warrants may be issued only upon a factually sufficient showing of probable cause. The specific defect urged by defendant is that the affidavit made no "affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein" and did not state "any sources for the affiant's belief."

If the affidavit itself was all that Judge Anderson had before him as the basis for issuance of the warrant, the validity of the warrant might well be in doubt. But that was not all, for Judge Anderson elicited additional sworn statements from Detective Anderson in which the detective detailed the sources of his information and the basis for believing that the explicitly described property would be found in defendant's apartment. Even though the result of a subsequent search cannot validate an unlawful warrant, the subsequently established accuracy of those descriptions recited in the affidavit [4] is itself a strong indication that Detective Anderson was indeed in possession of reliable information and lends credence to his testimony at trial that he had in fact disclosed such information to Judge Anderson.

The essence of defendant's argument is that, regardless of whether Detective Anderson had a factual basis for his application and regardless of whether he made sworn disclosure orally to Judge Anderson, the establishment of probable cause rises or falls upon the fact of the affidavit alone. We hold otherwise. The Fourth Amendment contains no prescription for the form or manner of showing probable cause, and an

---

§ 626.10 provides: "The affidavit or affidavits must set forth the facts tending to establish the grounds of the application, or probable cause for believing that they exist."

[4] The search was conducted by Detective Anderson and police partners. They found pieces of brown paper in the toilet bowl, matching the torn-out portions of the brown paper mask. They found a shirt "lying in a heap * * * by the closet door," the sleeves of which were turned inside out. Two cut marks through the shirt were surrounded by dark-colored, damp stains. Dark-colored pants were found with both legs turned inside out, bearing wet stains which appeared to be blood. A holster, gun, and clip were found hanging in the closet, and there appeared to be blood stains on the gun. Philip Graves, who shared the apartment with defendant, was not then at home but later testified that none of the items belonged to him.

affidavit may be supplemented by the magistrate's personal interrogation of the applicant for the warrant. Miller v. Sigler (8 Cir.) 353 F. (2d) 424, 426, certiorari denied, 384 U. S. 980, 86 S. Ct. 1879, 16 L. ed. (2d) 690.[5] We think, too, that the procedure was in substantial conformity with our own constitutional and statutory requirements.[6]

Our decision in no sense is based upon an impermissible *presumption* of Detective Anderson's personal knowledge, a basis rejected in Gior-

---

[5] See, also, Gillespie v. United States (8 Cir.) 368 F. (2d) 1, 4, and Lopez v. United States (5 Cir.) 370 F. (2d) 8, 10; People v. Schnitzler, 18 N. Y. (2d) 457, 460, 276 N. Y. S. (2d) 616, 223 N. E. (2d) 28, 30; State v. Titus, 107 N. H. 215, 217, 220 A. (2d) 154, 156; State v. Lampson, 260 Iowa 806, 149 N. W. (2d) 116; cf. Commonwealth v. Penta, 352 Mass. 271, 225 N. E. (2d) 58.

[6] Our statutes, *supra* footnote 3, implementing the constitutional mandate, provide for supporting affidavits of probable cause and the reduction of sworn statements to affidavit form. Detective Anderson's sworn testimony was not reduced to writing, but we do not view this as a fatal defect. It would have been far better practice, of course, for all essential information to have been stated in the original affidavit or, alternatively, that Detective Anderson's sworn statements be reduced to writing and subscribed by him. Neither the constitution nor the statutes, however, should be construed to exalt form above substance, the important thing being that the magistrate himself shall have a reliable basis for the issuance of the warrant. The procedure here used does not invite serious criticism. Detective Anderson and his colleagues, who were actively engaged in the investigation of a serious crime committed only a few hours earlier, were doubtless in a hurry to get a search warrant without delay because of their concern that evidence, located in an apartment suspected to be "a gathering-place of certain holdup men," might be removed. They prepared the affidavit themselves, in longhand, at that late hour of night without legal or secretarial assistance. Judge Anderson himself was summoned from sleep without the normal facilities for conducting the hearing with the usual formalities. Even so, all the circumstances indicated that an investigation of considerable detail had occurred and that, although the officers were acting in haste, their haste was the product of substantial evidence and not mere surmise. Apart from the record itself, post-trial affidavits of Detectives Anderson and Pufahl, as well as Judge Anderson himself, remove any vestige of possible doubt as to the substance of the information upon which Judge Anderson issued the warrant.

denello v. United States, 357 U. S. 480, 78 S. Ct. 1245, 2 L. ed. (2d) 1503.[7] Our decision, rather, is conformable to the rationale of United States v. Ventresca, 380 U. S. 102, 108, 85 S. Ct. 741, 746, 13 L. ed. (2d) 684, 689, for we view the warrant in a "common sense and realistic fashion" rather than a "grudging or negative attitude" that otherwise "will tend to discourage police officers from submitting their evidence to a judicial officer before acting."

■ Defendant contends, next, that the police, in taking a sample of his blood without a warrant, violated his constitutional rights so as to require the exclusion of such evidence at trial. The state answers, however, that defendant voluntarily consented to the taking of his blood, in which case no constitutional issue is presented. The evidence of consent is in some dispute, but the trial court apparently resolved this issue of fact in favor of the state. According to testimony of Detective Russell Krueger and his partner, they went to the General Hospital and informed defendant that they were police officers. They told him they "needed some blood samples for our investigation of the homicide out at the Super Fair Store" and asked him if it "was all right to take some blood samples." Defendant "nodded his head in the 'yes' fashion." The blood sample was then taken from defendant by a doctor of the hospital's medical staff. Defendant, however, asserts that he misunderstood the police officer's question and thought that the blood was requested by the medical staff for his medical treatment. He asserts, in addition, that he was in no con-

---

[7] In Giordenello, unlike the instant case, the supporting affidavit contained no affirmative allegation of the affiant's personal knowledge or the sources for his belief and his subsequent testimony clearly showed that he had in fact no personal knowledge of the matter. The recital of "facts" in Giordenello, moreover, was little more than a recital of the statutory elements of the crime charged. The court held that the deficiencies in the sworn complaint which constituted the only basis for the warrant "could not be cured by the Commissioner's reliance upon a presumption that the complaint was made on the personal knowledge of the complaining officer" and that a magistrate "should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime." 357 U. S. 486, 78 S. Ct. 1250, 2 L. ed. (2d) 1510. See, also, State ex rel. Duhn v. Tahash, 275 Minn. 377, 147 N. W. (2d) 382.

dition to give intelligent consent because he was at the time lying in an oxygen tent under sedation.[8] The court could, on this evidence, find that defendant had knowingly and voluntarily consented to the taking of his blood and thus waived any constitutional right proscribing the taking without a warrant. See, Johnson v. Zerbst, 304 U. S. 458, 58 S. Ct. 1019, 82 L. ed. 1461. See, also, Judd v. United States, 89 App. D. C. 64, 190 F. (2d) 649; Channel v. United States (9 Cir.) 285 F. (2d) 217; Villano v. United States (10 Cir.) 310 F. (2d) 680.

We are not squarely confronted, therefore, with the broader issue of constitutional limitations upon taking of blood without a warrant. We are not unmindful that, absent unusual circumstances, an intrusion upon the body of a citizen should properly be made only by authority of a warrant issued by a magistrate, for it is a search and seizure within the limitations of the Fourth Amendment. See, Schmerber v. California, 384 U. S. 757, 86 S. Ct. 1826, 16 L. ed. (2d) 908.[9] See, also, Rochin v. California, 342 U. S. 165, 72 S. Ct. 205, 96 L. ed. 183.[10]

[8] Because of his claim that he was under such sedation, the court inquired of counsel as to whether the hospital chart would at some point be introduced into evidence for the obvious purpose of indicating the time and extent of sedation. Defendant's counsel replied that "there would be a serious, strenuous objection if it was attempted." Defendant's recollection of the events surrounding the taking of his blood is itself palpably inconsistent with a mind blurred by sedation.

[9] In the Schmerber case the defendant was hospitalized for injuries suffered in an automobile accident, at which time a physician, at the direction of a police officer, took a blood sample from the defendant for purposes of chemical analysis to support a charge of driving while under the influence of intoxicating liquor. The exigent circumstance was that delay in taking of the blood sample could result in the dissipation of the blood alcohol by natural body function. Although the taking of blood was approved under these circumstances, the court there warned (384 U. S. 772, 86 S. Ct. 1836, 16 L. ed. [2d] 920): "The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, *or intrusions under other conditions.*" (Italics supplied.)

[10] In the Rochin case the police, without even pretense of consent, had

"The relevant test [for the necessity of a search warrant]" as stated, post-Schmerber, in Cooper v. California, 386 U. S. 58, 62, 87 S. Ct. 788, 792, 17 L. ed. (2d) 730, 734, "is not whether it is reasonable to procure a search warrant but whether the search was reasonable." It could hardly be doubted that a magistrate would have had reasonable grounds for issuing a warrant in this case on the basis of all of the facts then known, including the evidence already obtained by the warranted search of defendant's apartment. Even were we to credit defendant's claimed unilateral misunderstanding as to the purpose for which his blood sample was requested, the good-faith understanding of the police officers that he had unequivocally consented, thus eliminating any necessity for a warrant, was not unreasonable. Although there was no exigent circumstance of the kind present in Schmerber or in our own case of State v. Emerson, 266 Minn. 217, 123 N. W. (2d) 382, the taking under the conversational circumstances of this case was not unreasonable [11] or offensive to "a human sense of decency." [12] The rejection of evidence procured by unlawful search and seizure is a prophylactic rule to constrain police abuse of citizens. There would, in the circumstances of this case, be no justification for such prophylaxis.

■ Defendant's claim that the evidence is insufficient to support a conviction of first-degree murder is without merit. Confronted with the testimony of the several witnesses to the crime, the articles produced by the search of his apartment, and the comparative analyses of the blood sample taken from defendant and the blood on his clothing and paper mask, defendant testified in his own behalf. He admitted that he had gone to Hanson's Super Fair Store at the time of the crime, that he had

---

taken an arrested suspect to a hospital where his stomach was pumped and an emetic solution was forced into his body to cause vomiting as a means of recovering incriminating capsules of narcotics which the police believed defendant had swallowed just as he was about to be arrested.

[11] In Schmerber v. California, 384 U. S. 757, 770, 86 S. Ct. 1826, 1835, 16 L. ed. (2d) 908, 919, the court stated: "The officer in the present case * * * *might reasonably have believed* that he was confronted with an emergency * * *." (Italics supplied.)

[12] Rochin v. California, 342 U. S. 165, 174, 72 S. Ct. 205, 210, 96 L. ed. 183, 191.

gone for the purpose of robbing it, and that he armed himself with a gun which he knew to be loaded with live rounds of ammunition. He asserted, however, that the shot which inflicted the mortal wound was not aimed at the victim with any intent to shoot him; rather, that the trigger was pulled as a reflex action when he was struck with the boning knife. He testified:

"And at that time I took my eyes off him and I felt the knife, you know, going in my chest, and I just tightened up and the gun went off, you know, and I fell back and I tried to pull the knife out, you know, right after it hit me. Well, a round went off and I fell back and I tried to pull the knife out and another one went off and I finally got it out and I saw him laying down there on his face."

"In other words," his counsel followed up, "the gun fired accidentally on both times?" The defendant's answer as to the second shot was less positive, for he said, "Well, it could have been—it was accidentally, but the first time I figure it was my reflexes."

The trial court understandably was not persuaded. The credibility of the witness, in general, was not such as to inspire belief, and the circumstances relating to the firing of his gun were particularly unworthy of credit. A laboratory analyst for the State Crime Bureau testified that the gun was a semi-automatic weapon which required a separate 4¼-pound pull of the trigger for each shot fired. Whether, contrary to the expert testimony, either shot might have been unintentionally fired by recoil, the shot which killed the decedent was simply too deadly in its accuracy to permit belief that it was merely an accidental or reflex action. Nothing in the evidence, moreover, would commend the credibility of defendant's claim that he carried the gun only to "bluff" his robbery victims. Defendant's purpose in demanding that decedent drop the boning knife was, as he testified, because "I didn't want him to be throwing it at me." The court could well find, under all these circumstances, that defendant had made a deliberate effort "to shoot it out" with his victim.

A finding of premeditation and intent to cause death is not dependent upon admission by the accused or other direct proof but, like other facts, may be found by reasonable inference from other evidence. State

v. Gavle, 234 Minn. 186, 197, 48 N. W. (2d) 44, 51. It may be inferred from the manner of shooting the victim. State v. Hare, 278 Minn. 405, 154 N. W. (2d) 820. The determination to effect death need not exist for any length of time, State v. Brown, 41 Minn. 319, 43 N. W. 69, and in this case could well have been formed in those moments of hostile confrontation between defendant and decedent. The evidence, however, is more overwhelming than that. Where, as here, defendant prepared himself for the robbery by taking a gun which he has first examined to make certain that it contains live ammunition, thus prepared to shoot anyone who obstructs the robbery or his escape, the inference of premeditation and intent to shoot and kill is not only permissible, but virtually inescapable. State v. Gowdy, 262 Minn. 70, 113 N. W. (2d) 578; State ex rel. Fruhrman v. Tahash, 275 Minn. 242, 249, 146 N. W. (2d) 174, 179.

Affirmed.