STATE of South Dakota, Plaintiff
and Respondent,

v.

V. Chris BEAN, Defendant
and Appellant.

No. 12098.

Supreme Court of South Dakota.

May 3, 1978.

John P. Guhin, Asst. Atty. Gen., Pierre, for plaintiff and respondent; William J. Janklow, Atty. Gen., Pierre, on the brief.

R. N. Woodruff of Mueller & Bennett, Belle Fourche, for defendant and appellant.

WOLLMAN, Justice.

Defendant appeals from a judgment of conviction that was entered on a jury verdict finding him guilty of two counts of attempted murder. We affirm.

On the evening of February 25, 1976, defendant, who was then nineteen years of age, attended a party that was being held in the home of his father, Art Bean, in the city of Belle Fourche. Defendant at that time was not a regular inhabitant in his father's home. Among those at the Bean home that evening were Karie Weldon, age fourteen, Becky Cooper, Leonard Alvarez, and Danny Thompson. We had occasion to write of this teenage party and the events that occurred in the early morning hours of February 26, 1976. See *People in Interest of L. V. A.*, S.D., 248 N.W.2d 864.

Viewing the evidence in the light most favorable to the verdict, as we must, the jury could reasonably have concluded that the following facts had been established.

According to Karie Weldon's testimony, at approximately 1:00 a.m. on February 26, 1976, Danny Thompson made the remark that they were going to go downtown and shoot around and harass the police. Another teenager who was in attendance at the time testified that Leonard Alvarez stated that they should go downtown and shoot some street lights and that if someone tried to catch them they could probably shoot the cherries (the red lights on the roof of the police cars) and stall the police. Danny, Leonard, and defendant then loaded some .22 caliber rifles that were present in the Bean residence and left the house with the weapons. Approximately one-half hour later defendant returned to the Bean residence carrying one of the rifles that one of the other two boys had carried at the time the three left the residence. Defendant sat down and said, "The first cop that comes through that door I'm going to shoot." Defendant made a statement about having made a phone call. He kept looking at his watch and saying, "Well, about now the police ought to be getting there." A few minutes later defendant said, "Well, I had better go down and pick them up about now," and left the Bean residence carrying the rifle that he had brought back with him earlier. Approximately ten minutes later defendant returned with Danny and Leonard. The three boys were breathing hard. Danny remarked that he had emptied his rifle, whereupon Leonard said, "Yeah, you should have seen those cops hi-tail it the other way when we started shooting." Although defendant made no statement at the time about having shot at the police car, he told Karie Weldon later that morning that Danny and Leonard had told him to call the police from a pay phone.

At 2:13 a.m. on February 26, 1976, the radio dispatcher for the Belle Fourche Police Department received a call from an individual who refused to give his name and who stated that he was being shot at. He gave the location of the alleged shooting and asked the dispatcher to send a police

car to the area. The dispatcher immediately called police officers Herb Lurz and Dan Rogers, who proceeded forthwith to the location described by the anonymous caller. Upon arriving at that area in their police car, the officers floodlighted the area with spotlights for approximately three minutes. Upon seeing nothing suspicious and hearing no shots of any kind, the officers started to drive away. As they were turning the corner they were fired upon by unknown assailants. At least four bullets struck the patrol car. Three spent rounds were later found inside the vehicle. One of the bullets passed so near Officer Rogers' head that the velocity of the moving air lifted his hair. Two bullets struck the large bar that formed a part of the protective barrier between the front and rear seats of the vehicle. One of these bullets struck so close to Officer Lurz' head that he felt lead glancing off his head. He later removed from his cheek two pieces of lead that apparently had ricocheted off when the protective bar was struck by the slugs. Still another bullet penetrated the red light on the top of the police car. Although no one was found at the point from which the officers concluded that the shots were probably fired, a total of thirteen spent .22 caliber rifle cartridge casings were found near a building in the area, described as the Spaulding Cabin. The distance from the points where the spent cartridges were found to the point at which the police car was driving at the time the officers were fired upon was not more than 50 feet. The Spaulding Cabin itself is some ten to twelve blocks from the Art Bean residence.

A search was made of the Art Bean residence during the late afternoon of February 26, and three .22 caliber rifles were seized pursuant to a search warrant. A Federal Bureau of Investigation agent testified at trial that the spent cartridges found at the scene of the shooting had been fired from the three rifles in question.

Officer Lurz testified that he had had a conversation with defendant during the late afternoon of February 26, during which defendant said that he had been downtown doing some shooting with Leonard Alvarez and Danny Thompson the preceding night, that he had gone back home, that he had then come back down and placed a phone call to the radio dispatcher to bring the police officers to the scene, and that he had then left. Defendant denied to the officer that he had shot at any officers.

Defendant testified that he, Leonard Alvarez, Danny Thompson, and Becky Cooper had left his father's residence sometime during the early morning hours of February 26, 1976, following some talk about going downtown and shooting at street lights. Each of the three boys was armed with a loaded .22 caliber rifle. They went to the Spaulding Cabin area, where they shot at some street lights. Defendant testified that he shot three times, that Leonard shot once, and that Danny shot four or five times. After sitting on a nearby hill with his companions for a few minutes, defendant left the area and returned to his father's home with Miss Cooper. Defendant later called the police from a phone booth near the Spaulding Cabin in response to Danny's request that he do so in order that Danny and Leonard could shoot the cherry off the top of the police car. Defendant made the call to the police dispatcher, told Danny and Leonard that the police were sending a unit in a few minutes, and then left and returned to his father's residence. Defendant acknowledged that he knew that there would be shooting when the police arrived, although he claimed that the shooting would be directed only at the red light on the top of the police car.

Although defendant has filed and briefed some thirty-one separate assignments of error, we will discuss only those that are of arguable merit.

Defendant attacks the validity of the warrant under which the search was made of his father's residence and the seizure made of the rifles found therein. As we have already pointed out above, however, defendant had attained the age of majority on the date of the search. See SDCL 26–1–1. We held in State v. Lewis, 86 S.D. 763, 201 N.W.2d 397, that an eman-

cipated child does not have the same constitutional right of privacy in the family home as he might have in a rented hotel room. On the basis of the record before us, defendant had even less expectation of privacy in his father's home than did the defendant in the *Lewis* case inasmuch as defendant was not residing with his father at the time of the search and stood on the same plane with the other social guests insofar as his standing to complain of the allegedly illegal search and seizure was concerned. Cf. *Combs v. United States,* 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308; *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208.

■ Defendant contends that the trial court erred by denying his motion for a directed verdict of acquittal made at the close of the state's case. We do not agree. Although there was no direct evidence that placed defendant at the scene at the time the shots were fired at the officers, the circumstantial evidence, including the number of shots and the rapidity with which they were fired, together with the fact that defendant returned to the Bean residence with Danny Thompson and Leonard Alvarez shortly after his second foray out into the night following his avowal to shoot the first police officer that he saw, was sufficient to enable the jury to reasonably conclude that defendant had directly participated in a cold-blooded attempted annihilation of the two officers.

■ We also conclude that there was sufficient evidence to warrant a finding by the jury that defendant had the premeditated design to effect the death of the two officers. SDCL 22–16–4 provides:

"Homicide is murder when perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being."

SDCL 22–16–5 provides:

"A design to effect death, sufficient to constitute murder, may be formed instantly before committing the act by which it is carried into execution. Such design is inferred from the fact of killing unless the circumstances raise a reasonable doubt whether such design existed."

■ In *State v. Buffalo Chief,* 83 S.D. 131, 155 N.W.2d 914, we held that the design to effect death need exist for only an instant before the commission of the crime, and that direct proof of deliberation and premeditation is not necessary but may be inferred from the circumstances of the killing. Granted that no one was killed in this incident, we think that the principles expressed in the *Buffalo Chief* case are nonetheless applicable in the instant case. All of the circumstances surrounding the attack upon the officers support a conclusion that defendant had a premeditated design to effect the death of the officers. "Use of a deadly weapon with opportunity to deliberate is evidence of malice, deliberation, premeditation and intent to kill." *State v. Kelley,* 253 Iowa 1314, 1322, 115 N.W.2d 184, 189; see also *State v. Schatterman,* Iowa, 171 N.W.2d 890; *State v. Campbell,* 281 Minn. 1, 161 N.W.2d 47. Likewise, the fact that the police officers were lured to the scene of the attack where their assailants lay hidden under the cover of darkness is a powerful circumstance supporting a finding of conscious, deliberate premeditation. As the Tennessee Supreme Court recently stated, "If the killing is accomplished by poisoning or by lying in wait, premeditation is obvious." *State v. Bullington,* Tenn., 532 S.W.2d 556, 560. The jury could very well have concluded from defendant's statement that he would shoot the first police officer that came through the door that defendant did in fact have the premeditated design to take the lives of the police officers. See *Robertson v. State,* 256 Ark. 366, 507 S.W.2d 513. Finally, the fact that at least three bullets penetrated the interior of the police car and came within fractions of an inch of striking the officers is a circumstance from which the jury could very well have concluded that defendant fired upon the officers with a premeditated design to effect their deaths. *State v. Campbell,* supra.

■ In summary, then, what we said in *State v. Nelson,* 80 S.D. 574, 129 N.W.2d 54, is applicable here:

"When the state has introduced evidence upon which, if believed by a jury, they may reasonably find the defendant guilty of the crime charged, the state has made out a prima facie case, and the jury, not the judge, ought to pass upon it." 80 S.D. at 575, 129 N.W.2d at 55.

We conclude, therefore, that the trial court did not err in overruling defendant's motion for a directed verdict of acquittal at the close of the state's case.

■ Defendant requested an instruction on motive. Defendant's proposed instruction incorporated the language of South Dakota Pattern Jury Instructions (Criminal) 1–12–4, except for the last sentence of that instruction, which provides, "Good motive alone is never a defense where the act done or omitted is a crime." Although we are somewhat surprised that the requested instruction was not given inasmuch as the state's attorney indicated that the state had no objection, we conclude that the trial court did not commit reversible error in refusing to give the instruction. Although some courts have held that an instruction on motive is necessary, see, e. g., *Trobough v. State,* 119 Neb. 128, 227 N.W. 443; *State v. Vigil,* 87 N.M. 345, 533 P.2d 578, we conclude that the better rule is that which holds that the refusal of the trial court to give such an instruction is not reversible error. See, e. g., *People v. Romo,* 14 Cal.3d 189, 121 Cal.Rptr. 111, 534 P.2d 1015; *People v. Bermijo,* 2 Cal.2d 270, 40 P.2d 823; *State v. Shipley,* 259 Iowa 952, 146 N.W.2d 266; *State v. Taylor,* 356 Mo. 1216, 205 S.W.2d 734; *State v. Cor,* 144 Mont. 323, 396 P.2d 86.

■ Defendant requested an instruction on abandonment of attempt based upon the second paragraph of Pattern Jury Instruction 3–7–90c. We conclude that the proposed instruction was not applicable, however, because the record reveals that there was no evidence that defendant ever abandoned his intent to commit the crimes charged. A trial court need not instruct on

matters that have no support in the evidence. *State v. Zemina,* 87 S.D. 291, 206 N.W.2d 819; *State v. O'Connor,* 86 S.D. 294, 194 N.W.2d 246; *State v. Johnson,* 81 S.D. 600, 139 N.W.2d 232.

■ Defendant requested an instruction based upon Pattern Jury Instruction 3–7–90b, which distinguishes between mere preparation for the commission of an offense and the actual attempt to commit the offense. Although the proposed instruction embodied the distinction between acts of preparation and acts actually constituting an attempt, see, e. g., *State v. Martinez,* 88 S.D. 369, 220 N.W.2d 530; *State v. Judge,* 81 S.D. 128, 131 N.W.2d 573, we conclude that as with the instruction on abandonment of attempt, the evidence did not mandate the giving of the instruction in question. Defendant has cited no argument or authority to demonstrate that the failure to give the requested instruction was prejudicial error. Accordingly, although the trial court might very well have given the requested instruction, we conclude that the trial court's refusal to do so did not constitute reversible error.

■ Defendant complains of the trial court's refusal to give his requested instruction concerning the essential elements of the crime of attempted murder. We conclude, however, that the trial court's instruction, based upon Pattern Jury Instruction 3–7–310a, adequately instructed the jury on this matter. Although it may very well be that the trial court should have given an additional instruction patterned after Pattern Jury Instruction 3–7–90a, which sets forth the essential elements of the offense of attempting to commit a crime, defendant made no request for such an instruction. We conclude that when read as a whole, the instructions given by the trial court on the elements that the state was required to prove beyond a reasonable doubt adequately covered the matters set forth in defendant's requested instruction.

We have considered defendant's allegations of error regarding the failure of the

trial court to give other requested instructions. We conclude that many of the requested instructions were substantially covered in the trial court's instructions and that the rejection of those instructions that were not also included was not prejudicially erroneous. Likewise, other errors complained of in the trial court's instructions do not rise to the level of reversible error.

■■■■ Defendant contends that the trial court erred in denying his post-trial motions for a directed verdict of acquittal and for judgment notwithstanding the verdict inasmuch as the evidence was insufficient to sustain the verdict. We conclude, however, that what we said earlier concerning the sufficiency of the evidence to warrant the trial court in submitting the matter to the jury adequately answers this contention.

We have considered defendant's other assignments of error and conclude that they are without merit.

Shortly before this case came on for argument, defendant made a motion that we grant a hearing upon defendant's motion for a new trial or, in the alternative, that we remand the case to the circuit court for the purpose of permitting defendant to make a motion for a new trial. This motion was supported by the affidavit of Leonard Alvarez. In substance, the affidavit states that affiant had refused to testify on behalf of defendant at defendant's trial in this matter upon the ground that his answers might tend to incriminate him; that in June of 1977 affiant had pleaded guilty to a charge of assault with a deadly weapon without intent to kill based upon the shooting incident in question; that affiant is now willing to testify in defendant's behalf and that if permitted to testify his testimony would be to the effect that he knew of no intent on the part of defendant to kill any individuals on the night in question, that defendant was not present at the time the shots were fired at the police officers, and

that affiant and Danny Thompson were the only individuals who fired the shots that resulted in the criminal charges against defendant.*

SDCL 23–51–15 provides:

"The Supreme Court, after an appeal has been perfected, may, under the conditions specified and in the same manner as provided by § 15–30–1, remand the record to the trial court for the purpose of entertaining a motion for new trial."

SDCL 15–30–1 provides:

"Whenever, after appeal to the Supreme Court, it shall appear to the satisfaction of the Supreme Court upon application of a party that the ends of justice require that such party should be permitted to make a motion for a new trial for a cause set forth in subdivisions (1), (2), (3), or (4) of § 15–6–59(a), and that sufficient excuse exists for not having made said motion prior to the appeal, the Supreme Court may remand the record to the trial court for the purpose of making such motion, but no such remand shall be made unless such motion can be made and hearing thereon had in the trial court within the time permitted by law for appeal."

■■■■ The judgment of conviction on the jury verdict was entered on October 29, 1976. Pursuant to SDCL 23–51–6, defendant had sixty days within which to take an appeal from the judgment of conviction. Defendant's motion was not filed in this court until September 1, 1977. In *Iversen v. Terriere,* 78 S.D. 518, 105 N.W.2d 76, this court held that what is now SDCL 15–6–59(d) requires that a motion for a new trial be made during the time within which an appeal lies from a judgment and that what is now SDCL 15–30–1 is a limitation upon this court's power to remand the record to the trial court for the purpose of entertaining a motion for new trial. Cf. *State v. Olesen,* 86 S.D. 367, 196 N.W.2d 362. We

---

* Before he could be brought to trial on charges resulting from his alleged participation in the shooting incident, Danny Thompson died in the Butte County Jail. The Rapid City Journal, October 20, 1976, at 2, col. 1. See also the state's affidavit in support of its motion to dismiss the appeal from an intermediate order in # 11951, *People in the Interest of Danny Joe Thompson,* a companion appeal to the *L. V. A.* case, supra.

conclude that the same limitations upon our power to remand to the circuit court for the purpose of entertaining a motion for new trial prevent us from entertaining a motion for new trial in the first instance in this court. We need not consider what procedural avenues are open to defendant for the consideration of the matters contained in the Alvarez affidavit. Cf. *State v. Gerdes,* S.D., 258 N.W.2d 839; *Pickering v. State,* S.D., 260 N.W.2d 234.

Defendant's motion for a new trial or for remand of the case to the circuit court for the purpose of making a motion for a new trial is denied. The judgment of conviction is affirmed.

DUNN, C. J., and PORTER and MORGAN, JJ., concur.

ZASTROW, J., concurs specially.

ZASTROW, Justice (concurring specially).

Although I concur in the majority opinion, because of my concern for the validity of the conviction of the defendant for attempted murder under SDCL 22–4–1, I wish to clarify my position on the subject.

SDCL 22–4–1 provides that:

"Every person who attempts to commit any crime and in such attempt does any act toward the commission of such crime, but fails or is prevented or intercepted in the perpetration thereof, is punishable *where no provision is made by law for the punishment of such attempt,* as follows * * *." (emphasis added)

A similar attempt statute was held inapplicable to an attempted poisoning where there was a specific statute making an attempt to kill by poisoning a separate crime. *Minter v. State,* 1942, 75 Okl.Cr. 133, 129 P.2d 210. This would appear to be a general theory of criminal law. See generally, 22 C.J.S. Criminal Law § 74, et seq. It would appear that there is a "provision * * * made by law for the punishment of [an] attempt" to kill by shooting a firearm. The common law distinction between attempted murder and assault with intent to kill was apparently the element of "malice afore-thought" required for murder. Because that element has been omitted from our statutory definition of murder, the distinction seems to have been removed. 40 C.J.S. Homicide § 68, et seq.; 40 Am.Jur.2d, Homicide, § 564. However, no objection to the charge or sentence was made at the trial, nor has the issue been raised or briefed on appeal. As to the implication of such a principle, I therefore reserve judgment until it is properly raised and briefed.

Likewise, the question of whether shooting a firearm with the intent to kill (SDCL 22–18–9) and shooting a firearm without an intent to kill (SDCL 22–18–10 and 22–18–11) would be lesser included offenses and whether instructions should have been given has not been raised at trial nor on appeal.

Defense counsel did raise on appeal the issue of the propriety of the prosecutor's closing argument. Although I find the issue to be of merit, no objections were made at the trial and therefore the issue was not properly preserved for appeal.