**STATE of South Dakota, Plaintiff and Respondent,**

v.

**Leonard KOST, Defendant and Appellant.**

**No. 12536.**

Supreme Court of South Dakota.

Argued Sept. 18, 1979.

Decided March 26, 1980.

Judith A. Atkinson, Asst. Atty. Gen., Pierre, for plaintiff and respondent; Mark V. Meierhenry, Atty. Gen., and B. Elizabeth Ganje, Asst. Atty. Gen., Pierre, on the brief.

James R. Haar of Goetz, Hirsch, Haar & Klimisch, Tripp, for defendant and appellant.

HENDERSON, Justice.

## ACTION

A Hutchinson County jury returned a verdict of guilty of manslaughter in the first degree against Leonard Kost, appellant. Sentenced to life imprisonment, he appeals. We affirm.

## FACTS

Appellant, age 63, was charged with the murder of Josephine Graber, age 46, on January 5, 1978, by means of shooting her four times with a .22 caliber rifle in Freeman, South Dakota. Appellant pleaded not guilty and not guilty by reason of mental illness. The shooting occurred at the trailer home of the deceased. Appellant admitted that he had killed decedent, and the evidence established that he and the decedent had been involved in a romantic relationship for approximately one year prior to the shooting. The decedent had been married three previous times and was the owner-operator of Josephine's Cafe in Freeman.

Decedent began borrowing money from appellant in June, 1977; at the time of her death, she owed him $1,300. In the early part of December 1977, differences arose between the two. According to appellant, decedent had expressed an interest in seeing other men and, at that point, began ridiculing and acting indifferently towards him. From Christmas of 1977 up until the shooting, their relationship had steadily deteriorated.

The degeneration of their relationship erupted into violence on January 5, 1978. The record reveals that appellant began drinking early that morning. That afternoon he ate a sandwich and consumed half a bottle of 3.2 beer at his home. At approximately 6:00 p. m., appellant went to the VFW Club in Freeman where he ate supper, drank coffee and one mixed drink, played pinochle, and left at approximately 8:30 p. m. Witnesses' testimony indicates he left in a good mood. Appellant then drove to the home of Duane Finch to borrow a .22 rifle, ostensibly to shoot a rat in his garage. Finch furnished appellant with approximately twenty rounds of ammunition. At approximately 9:30 p. m., appellant appeared at the home of his sister and brother-in-law and informed them: "I just shot Josephine." His sister asked if she was dead and he replied, "If she isn't dead, she will die." He then gave the rifle to his brother-in-law and told him to call the sheriff saying, "I will sit down there and wait till he comes."

Appellant did not wait there; instead, he chose to return to the VFW Club and announced to several people that he had "just shot Josephine." Appellant's long-time friend, Arden Dewald, testified:

And he [appellant] said, "I just told you, I just—she just got to me and I just couldn't take it anymore." And he said, "I went down there and was talking to her and while I had the weapon pointed at her, she pleaded with me not to shoot her. She said, 'Please don't shoot me, please don't shoot me. I will make it right with you. I will do the best I can.'" And Leonard [the appellant] said, "The phone rang and I knew if she answered it, she would report me and I would just end up in trouble, and so I shot her . . . I shot her four times. . . ."

Appellant then proceeded to tell Dewald that he shot decedent four times: once in the chest and head and twice in the back. A pathologist described the entrance wounds as being on decedent's back, right chest, right arm, and right ear. One of the arresting officers told appellant, "We are arresting you for . . ." and appellant interjected, "murder." A note, written by appellant sometime during that day, was found in his home which read:

Dear sister and everybody else. I am sorry for what I am doing. Please understand what I mean. I owe the First National Bank $1,500 on my property. Sell it and give the rest to Bonnie. P.S. I am sorry.

Appellant's own testimony was that once inside the trailer, he and decedent had a violent verbal quarrel. He characterized himself as having brooded that day over the fact decedent was seeing two other men and that she wanted him to stay away. By his own sworn testimony, appellant admitted that he had asked for his $1,300 back and that she had voiced he would have trouble proving she owed him that amount. He told the jury that the breaking point came when she told him, "[I]f I could find one or two more dumb suckers like you, I

would have it made." His testimony was that his mind went blank and he could not remember anything about the shooting. Appellant contends that the note he left was a suicide note.

## ISSUES

### I.

Was there sufficient evidence to establish appellant's sanity beyond a reasonable doubt? We hold that there was.

### II.

Did the trial court err in denying appellant's motion for a directed verdict on the charge of premeditation? We hold that it did not.

### III.

Does the sentence of life imprisonment constitute cruel and unusual punishment? We hold that it does not.

## DECISION

### I.

Appellant argues that the trial court erred in denying his motion for a new trial as the evidence was insufficient to establish his sanity beyond a reasonable doubt. In determining whether denial of the motion was reversible error, we must consider all the evidence. *State v. Black Feather*, 249 N.W.2d 261 (S.D.1976); *State v. Olson*, 83 S.D. 493, 161 N.W.2d 858 (1968).

Two qualified psychiatrists, who both examined appellant, testified that he did not evidence any signs of psychosis or organic brain disorder. Appellant, however, relies heavily on the testimony of Dr. Stephenson, called by the State, who characterized appellant's mental condition at the time of the shooting as bordering on temporary insanity.

It has long been recognized that when a person's mental fitness is at issue, the State must prove beyond a reasonable doubt that the accused was mentally capable of the criminal intent required to consti-

tute the crime charged. *State v. Waugh*, 80 S.D. 503, 127 N.W.2d 429 (1964); *State v. Violett*, 79 S.D. 292, 111 N.W.2d 598 (1961). The statutory test for excusing criminal responsibility in this instance is whether at the time of committing the act charged against him, appellant was incapable of knowing its wrongfulness. SDCL 22–3–1(3); SDCL 22–1–2(22). The excusing degree is incapacity to distinguish right from wrong. *State v. Kingston*, 84 S.D. 578, 174 N.W.2d 636 (1970); *State v. Waugh*, supra; *State v. Violett*, supra. Therefore, the fact that appellant's mental condition could have bordered on temporary insanity at the time of the shooting does not absolve him of criminal responsibility. According to Dr. Stephenson, "He was still capable of knowing right from wrong." However, this was not the only evidence bearing on the issue.

Arden Dewald testified that shortly after the shooting appellant approached him at the VFW Club and imparted that he had just shot Josephine and gave an account of where the four bullets had entered. Dewald further testified that appellant expressed fear that he would be in real trouble if she answered the phone, so he shot her. Several witnesses, including appellant's sister, also testified that he confessed shooting the deceased that evening. In addition, one of the State Highway Patrolmen testified that when they informed appellant he was being arrested, he interjected, "[for] murder."

In *State v. Kindvall*, 86 S.D. 91, 191 N.W.2d 289 (1971), we held: "The acts, conduct and declarations of the defendant, both prior and subsequent to the act charged, as well as the time of its commission, are admissible to show his mental condition at the time of the act." In reviewing the record, we find that there was ample evidence to support the jury's determination that he was criminally responsible beyond a reasonable doubt; thus, the court did not err in denying him a new trial.

### II.

Appellant argues secondly that the trial court erred in denying his motion for a

directed verdict of acquittal on the grounds that the State failed to establish a prima facie showing of premeditation and therefore, the case should not have been submitted to the jury on the charge of murder. Appellant contends that the evidence adduced at trial was just as consistent in showing a design to commit suicide as it was to effectuate decedent's death.

■ Were we to assume that appellant may have contemplated suicide the night he entered decedent's home, the evidence introduced by the State, outlining all the surrounding circumstances, was nonetheless sufficient in making out a prima facie case of murder. The design to effect death need exist for only an instant before the commission of the crime. SDCL 22–16–5. We held in *State v. Bean*, 265 N.W.2d 886 (S.D. 1978) and *State v. Buffalo Chief*, 83 S.D. 131, 155 N.W.2d 914 (1968), that direct proof of deliberation and premeditation is not necessary but may be inferred from the circumstances of the killing.

■ Here, appellant himself testified that once inside decedent's trailer, an intense verbal quarrel ensued between them. Furthermore, a long-time acquaintance of appellant testified that appellant had remarked to him shortly after the shooting that decedent pleaded with him not to shoot her. The jury could have easily concluded that appellant shot decedent with a premeditated design to effect her death.

Appellant contends that notwithstanding that the jury found him guilty of manslaughter, he was nonetheless prejudiced by the court's ruling because the verdict could have represented a compromise between the maximum and minimum charges submitted to the jury. We find this argument unpersuasive and purely speculative. In passing upon the correctness of such a ruling, this Court has held:

When the state has introduced evidence upon which, if believed by a jury, they may reasonably find the defendant guilty of the crime charged, the state has made out a prima facie case, and the jury, not the judge, ought to pass upon it. *State v. Nelson*, 80 S.D. 574, 575, 129 N.W.2d 54, 55 (1964). We recently approved this language in *State v. Bean*, 265 N.W.2d at 891. We conclude, therefore, that the trial court did not err in overruling appellant's motion for a directed verdict of acquittal at the close of the State's case.

### III.

Appellant also contends that SDCL 22–6–1(1) is unconstitutional in that the punishment provided for the lesser included offense of manslaughter in the first degree (Class 1 felony) carries a greater penalty than does the greater offense of murder. At the time appellant was sentenced, a Class 1 felony under SDCL 22–6–1(1)[1] carried a penalty of imprisonment in the state penitentiary upward to a maximum sentence of life imprisonment. In addition, a fine not exceeding twenty-five thousand dollars could be imposed. The punishment prescribed for murder under 22–16–12[2] was life imprisonment.

■ Appellant was sentenced to life imprisonment; no additional fine was imposed. While the Constitution does not sanction the imposition of a greater punishment for a lesser included offense than lawfully may be imposed for the greater offense, appellant has failed to demonstrate that the sentence imposed here was greater. Furthermore, his reliance on *Thomas v. State*, 264 Ind. 581, 348 N.E.2d 4 (1976) is misplaced. There, the court adopted the earlier holding of *Dembowski v. State*, 251 Ind. 250, 240 N.E.2d 815 (1968) which held: "[T]he legislature may not, consistent with the commands of the State and Federal Constitutions, provide a punishment for a lesser included offense which is *greater in years on the face of the statute* than the greater offense." (Emphasis supplied). 251 Ind. at 253, 240 N.E.2d at 817. Here

1. This section has been reenacted as SDCL 22–6–1(2).

2. Murder has been redefined as a Class A felony. SDCL 22–6–1(1) provides that a Class A felony is punishable by death or life imprisonment in the state penitentiary, and that a lesser sentence may not be given.

the statute is not unconstitutional per se. The penalty imposed for murder was mandatory life imprisonment, while for manslaughter in the first degree, the judge was vested with the discretionary power of sentencing upwards to life. Therefore, appellant has failed to show that his constitutional rights were violated either by the sentence imposed or through the alleged unconstitutionality of the statutes.

Appellant's final contention is that his sentence to life imprisonment under the circumstances of this case constitutes cruel and unusual punishment. This point is without merit. The duration of the sentence prescribed is not so excessive or disproportionate to the nature of the offense committed as to shock the conscience and reason of men generally. *State v. Bad Heart Bull*, 257 N.W.2d 715 (S.D.1977); *State v. Becker*, 3 S.D. 29, 51 N.W. 1018 (1892). The vast majority of states prescribe life imprisonment as a permissible penalty for manslaughter in the first degree. Appellant has furnished no reason why the legislature's appraisal of the gravity of the crime in question is unconstitutional.

Accordingly, the judgment is affirmed in its entirety.

All Justices concur.